**In re COORDINATED PRETRIAL PROCEEDINGS IN ANTIBIOTIC ANTITRUST ACTIONS.\* 4–71 Civ. 435.**

United States District Court,
D. Minnesota,
Fourth Division.

June 25, 1975.

---

\* Consolidated with;

State of Washington, 4–71 Civ. 395; State of Oregon, 4–71 Civ. 392; State of Hawaii, 4–71 Civ. 397; State of Utah, 4–71 Civ. 398; State of Kansas, 4–71 Civ. 400; State of California, 4–71 Civ. 399; 4–71 Civ. 393, 4–71 Civ. 401 v. Chas. Pfizer & Co., Inc.

Atty. Gen., San Francisco, Cal., Slade Gorton, Atty. Gen., Olympia, Wash., Curt T. Schneider, Atty. Gen., Topeka, Kan., for State Counsel.

## MEMORANDUM OPINION APPROVING ALLOWANCE AND DISALLOWANCE OF CLAIMS, PLAN OF DISTRIBUTION AND AWARDING ATTORNEYS FEES

MILES W. LORD, District Judge.

This matter comes before the Court upon motion of the plaintiffs for an order approving a proposed plan of distribution and allowance and disallowance of claims in the above settled class actions. Also before the Court are nine applications for allowance of attorneys fees and costs.

The above actions were class actions brought by the Attorneys General of six States on behalf of their consumers. The cases were settled in 1973 and the processing of claims has continued since July of 1974. At this time, the Special Masters and the attorneys have recommended a plan of distribution and requested that the Court rule on the allowance and disallowance of claims. Pursuant to notice, a hearing was conducted before this Court on May 9, 1975 in regard to these matters. All States which were represented at the hearing and the informal conferences before the hearings have agreed to the proposed plan of distribution. All States have also agreed to the proposed allowance and disallowance of claims. No one appeared at the hearing to object to the proposed allowance of attorneys fees.

Crane, Martin, Claussen, Hamilton & Barry, Topeka, Kan., Ferguson & Burdell, Seattle, Wash., Law Offices of Joseph L. Alioto, San Francisco, Cal., Louis Marchese, Chicago, Ill., Paul D. Scanlon, Vienna, Va., Lee Johnson, Atty. Gen., Salem, Ore., Evelle J. Younger,

Under the present plan of distribution, approximately 980,000 consumers in the six states will be receiving refund checks. The Court notes the number of proposed recipients at the onset in order to familiarize the uninitiated with the tremendous magnitude and complexity of these settlements and the settlement administration.

## HISTORY OF THE CASE:

A thorough procedural and substantive history of these actions may be found in the Court's *Memorandum Approving Settlement,* dated March 21, 1974. A very thorough procedural and substantive history of the case may also be found in the report of the Special Master, which is on file with the Court. Due to the interest which this plan of administration has generated, the Court has directed that the Special Master cause this report to be published.

These actions are a small part of the coordinated pre-trial proceedings in the *In re Antibiotic Anti-Trust Actions,* 4-71 Civ. 435 (D.Minn. filed August 1, 1971). In 1958 the Federal Trade Commission issued a complaint against American Cyanamid Co., Chas. Pfizer & Co., Inc., Bristol-Myers Company, Olin Mathieson Chemical Corporation and the Upjohn Company. The Commission's proceedings continued until the mid 1960's, at which time compulsory licensing by Cyanamid and Pfizer was ordered.

In 1961 a criminal indictment was returned by the Federal Grand Jury of the Southern District of New York (61 Crim. 772) naming Cyanamid, Pfizer and Bristol and their chief executives as defendants; Squibb and Upjohn were named as co-conspirators. That indictment charged that the defendants, pursuant to a conspiracy, had misled the patent office in order to obtain a patent on tetracycline, and had used that patent to exclude competitors and to fix prices. All defendants pled not guilty. The criminal action was tried to a jury in November and December of 1968; the Honorable Marvin Frankel presiding. The jury returned a guilty verdict. The decision was appealed to the Court of Appeals for the 2nd Circuit. In April of 1970, that Court handed down its decision reversing the judgments of conviction and directing a new trial. *U. S. v. Chas. Pfizer & Co., Inc.,* 426 F.2d 32 (2nd Cir., 1970). The United States Supreme Court af-

firmed the Court of Appeals for the 2nd Circuit and the criminal action was remanded for retrial. *U. S. v. Chas. Pfizer & Co., Inc.,* 404 U.S. 548, 92 S.Ct. 731, 30 L.Ed.2d 721 (1971). Finally, on November 30, 1973, the Honorable John Cannella, Judge for the Southern District of New York, sitting without a jury, returned a verdict finding the defendants not guilty on all counts of the indictment. Thus, after eleven years, the Federal criminal proceedings ended where they had begun.

Upon the return of the guilty verdict by the jury in 1968, several private, treble damage actions were filed. The 160 plaintiffs included Cities, Counties, States, Consumers, Insurance Companies, Agricultural Users, Hospitals, Blue Cross/Blue Shield, Union Health and Welfare Companies, Competitors and Foreign Governments. The cases were all transferred to the Honorable Inzer B. Wyatt of the Southern District of New York, pursuant to 28 U.S.C. § 1407 by the Judicial Panel on Multi-District Litigation.

On February 6, 1969 the defendants made a written global offer of $100,000,-000.00 in settlement of all claims of the fifty States, Counties, Cities and their political subdivisions and agencies and any other governmental entities, excluding the Federal government, arising out of their purchases or payments for broad spectrum antibiotics. This included the claims of the States as *parens patriae* on behalf of their citizens, or as class representatives on behalf of their consumers, including the State as a consumer and all other consumers in the States. This offer also included the claims of wholesalers, retailers and individual consumers arising out of such purchases. The settlement offer was accepted in principle by most of the States. The States of California, Kansas, Hawaii, Oregon, Utah and Washington as well as the State of North Carolina elected not to accept that offer.[1]

---

1. The City and County of San Francisco and the County of Los Angeles initially accepted defendant's offer on behalf of their public hos-

pitals and citizens residing within the geographic boundaries of those entities. The State of California opposed the acceptance of

In June of 1970, Judge Wyatt approved the global settlement, adopting the so-called "Alabama plan" as the method for distributing that portion of the offered $100,000,000.00 going to plaintiffs accepting the offer. *State of West Virginia v. Chas. Pfizer & Co., Inc., et al.,* 314 F.Supp. 710 (S.D.N.Y., 1970). Had the six States in these actions accepted that plan, they would have received the following amounts:

California, including
  Los Angeles and
  San Francisco      $10,511,500.00
Hawaii             $ 267,300.00
Kansas            $ 1,392,000.00
Oregon            $ 791,000.00
Utah               $ 339,300.00
Washington       $ 1,549,900.00

These amounts were subject to a holdback of twenty percent for both institutional and consumer purchases which was to be used as a reimbursement for any further amounts that defendants might be required to pay to any Blue Cross Association or other insurer which may have indemnified the settling entity with respect to a portion of the payment so allocated.

The amounts which were finally deposited for the benefit of the consumers for these six States, including Welfare and the County of Los Angeles and City and County of San Francisco, pursuant to the terms of this settlement are as follows:

California          $28,140,000.00
Hawaii             $ 351,000.00
Kansas            $ 3,570,000.00
Oregon            $ 2,177,000.00
Utah               $ 1,143,000.00
Washington       $ 4,235,000.00

The approved settlement amounts are not subject to any holdbacks as were the original proposed settlements. The entire increase has been allocated to individual consumers within the States.

Following the election of these six States and certain other plaintiffs not to participate in the $100,000,000.00 settlement, Judge Wyatt, by pre-trial order No. 1, dated February 24, 1970, divided the non-settling cases into four categories.

1. City, County, State and United States Government cases (CCS cases).

2. Farm cases.

3. Miscellaneous cases.

4. Hospital cases.

Pre-trial order No. 1 also established the Plaintiffs National Steering Committee (PNSC), and a document depository at 55 Liberty Street, New York City, New York, to be used for defendants' documents discovered by plaintiffs.[2]

In February of 1970, the plaintiffs in the CCS cases moved the Court to establish those cases as class actions on behalf of the institutions and consumers within their boundaries. Before these motions were decided, the undersigned Judge was designated to sit in the Southern District of New York and all of the non-settling cases in these actions were transferred to him pursuant to order of the Judicial Panel on Multi-District Litigation and with the full consent and agreement of Judge Wyatt.

On April 13, 1971, Class Action Order No. 71–11 established that the non-settling state actions were to be maintained as class actions pursuant to Rule 23, Fed. R.Civ.P. The individual States were named as representative parties on behalf of a class of purchasers within that

the plan by San Francisco and Los Angeles on various legal grounds and finally reached an accord by which the City and County of San Francisco and County of Los Angeles agreed to withdraw from the settlement and permit the Attorney General to litigate on behalf of all California citizens. Certain terms were reached between the State of California and

the City and County of San Francisco and the County of Los Angeles which will more fully be discussed *infra.*

2. The make-up and work of the PNSC and its chairman are discussed in the Court's Memorandum Opinion in the *Doughboy* action, dated May 1, 1975. The CCS lawyers have at all times been active participants of the PNSC.

State who during the period between 1954 and 1966 purchased or paid for broad spectrum antibiotic products for human consumption from public or private hospitals or from pharmacies, drug stores or other retail outlets. The State itself was included as a purchaser due to payments made by it for the benefit of recipients of welfare programs.

Class Action Order No. 71–11 directed that notice be given to the members of the consumer class defined therein in the form and manner prescribed by that order. In May of 1971, pursuant to Class Action Order No. 71–11, notice was provided by mail to each household in the non-settling States advising the residents of each State of the pendency of the class action on behalf of all consumers within the State, and further advising them that they would be included in the action unless they filed a timely written election to be excluded.[3] Certain consumers did file such an election, and were excluded from the class.

By separate order, a class was established on the behalf of the institutions in each State and pursuant to that order notice was given to each institution of the pendency of the class action. Certain other classes in other cases were also established at that time.

Following the establishment of the PNSC and the classes, the parties engaged in extensive and exhaustive discovery throughout 1971, 1972 and 1973.

The Court, in its various opinions, has talked at some length about the great magnitude and efforts of discovery taken in these cases. Over a million documents were deposited by the defendants, pursuant to order of this Court, in the depository in New York City.

Over 250,000 documents were copied by all of the plaintiffs, and transferred to a separate document depository in California.

■ The question of a prima facie showing of fraud or tort upon the patent office as it affected certain evidentiary privileges was argued against defendants, American Cyanamid Company, Pfizer Co., Inc. and Bristol-Myers Company before three Special Masters appointed to review documents.[4] The Masters ruled upon these motions, finding a prima facie showing of fraud before the patent office, thereby abrogating much of the work product and attorney-client privilege claimed by these three defendants.

During all of this time, the parties were also engaged in extensive pre-trial conferences with the Court, arguments and preparing for depositions. Economic work, which will be discussed *infra,* was also proceeding.

In February of 1973, depositions commenced. Over 400 depositions were taken in this case, in all parts of the United States, Europe, Australia and Hong Kong. Many of these depositions were

---

**3.** Since the implementation and effective utilization of Rule 23 is dependent upon Judge-made law, it is incumbent upon Judges who have had first-hand experience in this type of litigation to share their experience through publication. For this reason, this Court may further discuss the subject of initial notice to the class members in a supplemental memorandum. The basis of that discussion will be an attempt to analyze the costs of notification as they relate to the legal effect upon the parties in cases where the members of the class are not identifiable by reasonable means (unlike the case of *Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). In view of the tremendous capital outlay in giving individual notice, a statistical study of the efficacy of the notice procedure in the case at bar will be attempted to give some

guidance as to whether or not such notice procedures are justified.

At the present time, the Court feels that the benefit of the individual original notices was small as compared to the tremendous cost involved. A less expensive and more useful method should be studied.

**4.** Both sides in this litigation have been charged with the expenses of these Masters. The defendants originally offered to pay all of the expenses of the examination of privileged documents and the Court declined the offer. This was a major mistake and imposed an almost insurmountable economic burden upon the plaintiffs. In the future the party claiming privilege will and should pay the costs of the Master.

taken directly by the CCS plaintiffs. Others were taken by other members of the PNSC. In the long run, all of the discovery efforts conducted by the PNSC were helpful to all of the plaintiffs and were contributed to by all plaintiffs.

Even before the cases were transferred to the Southern District of New York by the Judicial Panel on Multi-District Litigation, the State of California retained a team of economic and statistical experts to begin preparation of an economic study consisting of a theory and measure of damages for institutional, welfare and consumer purchases. In June of 1971, California filed its first economic brief. The Court, upon the filing of the brief, appointed an economic expert, Dr. Francis Boddy of the University of Minnesota, and statistical expert, Dr. Neter to review California's materials, defendants' responses thereto, and mediate informal meetings between California and defendants' statistical experts for the purpose of auditing the California's statistical methodology. With California leading the way, the other States retained economic experts and statisticians to perform similar studies for them. At the request of the Court, after analysis, the States adopted many of the procedures followed by the California experts and much of the material of national significance which had been prepared by them.

During 1971 and 1972, the Court's experts conducted several informal conferences with the various economists, from both sides, in an effort to exchange views and clarify the economic and damage studies. California, as a result of these conferences, filed a revised damage study and the defendants filed responses thereto. The contribution of California in its early preparation and work in preparing the damage studies cannot be overstated. California expended enormous amounts of money to prepare this damage brief. Without this damage brief and the subsequent one filed by the other States, it is doubtful that such a fruitful settlement would have been possible.

While the economic aspects of the case were being argued, documents being produced and depositions going forward, settlement negotiations were occurring on a sporadic level. In May of 1973, the non-settling States moved this Court for an order setting the cases for trial at the earliest possible date. Pursuant to order of this Court the State plaintiffs filed a trial brief which exceeded 600 pages and which spelled out in great detail the case which they intended to prove. Following a summer of arguments, the Court, on August 27, 1973, directed that the trial of the CCS cases would commence no later than October 10, 1973. On September 12, 1973, a settlement with the defendants was reached by the States of Washington, Kansas, Oregon, Hawaii and Utah. Separate negotiations continued with California and a settlement with California was reached on October 3, 1973.

On October 17, 1973, a memorandum of agreement was signed by counsel for all of the parties in each of the settling State cases. On October 31, 1973, the Court entered Class Action Order No. 73–36 in each of the pending CCS cases directing that notice be mailed to each of the institutions which had made a claim in these actions and to each household in each State, advising them that a hearing would be held in Minneapolis, on February 13, 1974 to determine the fairness and adequacy of the proposed settlements and further advising them that they might appear either in person or by written submission to object to the fairness and adequacy of the settlement. On March 21, 1974, following the hearing, the Court entered its *Memorandum and Order Approving Settlement* for each of the six States involved in these actions and signed orders and judgments dismissing the actions with prejudice.

The defendants, in entering into this settlement denied and continue to deny, any liability and the Court has made no finding thereof.

One other State, North Carolina, rejected the early $100,000,000.00 settle-

ment offer. That case was also transferred to the undersigned Judge. In the Spring of 1973, counsel for the State of North Carolina requested that the action be transferred back to the Eastern District of North Carolina for all purposes. The matter was transferred and tried before the Honorable Franklin T. Dupree, Jr. of the Eastern District of North Carolina, sitting without a jury during the Summer, Fall and Winter of 1973. In the Summer of 1974, Judge Dupree entered a judgment, finding for the defendants on all counts, and dismissing the North Carolina action with prejudice.

The amount of work and effort that went into the achievement of this settlement by both public and private lawyers is staggering. The Court congratulates and praises the lawyers involved for their tremendous efforts and accomplishments. One lawyer's contributions deserved to be singled out. Throughout these cases, the Court was ably assisted by Special Master Thomas C. Bartsh, who not only supervised and presided over the myriad of matters that arose in this litigation, but also coordinated and supervised the activities of the other Masters appointed by the Court, including court appointed economists. Without the day-to-day assistance of Special Master Bartsh, the Court could not have efficiently and expeditiously handled these very complex cases. His unstinting efforts and professional competence contributed immeasurably to the successful disposition of these cases. The Court congratulates counsel and Special Master Lebedoff for the excellent job in the administration of the settlement funds.

## THE SETTLEMENT FUNDS:

Pursuant to the settlement agreement and Administrative Order No. 74–58, the funds for the consumer settlements and the institutional settlements were deposited with a Court appointed Escrow Agent in July of 1974. The total deposited was $38,506,645.43. The Court directed the Escrow Agent to divide the funds into three separate parts. Fund A, consisting of $26,651,645.43, was designated as funds for the consumer settlement. Fund B, consisting of $7,355,000.00, represented that part of the total settlement which was for institutions. Fund C, consisting of $4,500,000.00, was set aside for payment of administrative costs and out-of-pocket expenses.

Pursuant to orders of this Court, Fund A was invested by the Escrow Agent for an original period of six months. Bids were solicited from banks throughout the United States with the highest bidder receiving the funds for a six month period. At all times Fund A has been fully collateralized. After the original six month period, bids were again solicited and the funds were reinvested. Fund B, the institutional money, was also invested pursuant to order of this Court. All interest earned on Fund B was paid to the institutions involved.

A small portion of Fund C was kept in a checking account with the Escrow Agent. The remainder of the funds were invested in short and medium term deposits which were directed to the checking account as needed to pay expenses.

Fund A and Fund C, which are the funds earmarked for distribution in this settlement, totaled $31,151,645.43 when deposited. Interest earned on these funds is in excess of $2,000,000.00. The total funds left to be distributed, without deduction for administration costs and out-of-pocket expenses, will exceed $33,000,000.00. The funds are still on deposit and earning interest and will continue to do so until the time of distribution. The $2,000,000.00 plus dollars that have been earned in interest in the eleven months since the deposit of the settlement funds nearly cover the total cost of distribution. When one takes note of the tremendous number of claims that were filed, processed, reviewed, approved or denied, the Court feels that this has indeed been a major but inexpensive accomplishment.

*ALLOWANCE AND DISALLOW-ANCE OF CLAIMS—SETTLEMENT DISTRIBUTION ADMINISTRATION:*

Upon approval of the settlement, the Court appointed David Lebedoff, Esq. as a Special Master to develop and supervise a plan of settlement distribution and administration.

A complete description of the distribution procedures is contained in the report of the Special Master. Since the report is some 60 pages long without appendices, the Court does not intend to review all those procedures here. Each procedure was thoroughly reviewed by the Court and approved before being put into effect.

Over 10,000,000 claim forms were originally sent out to the consumers in the six settling States. One of the largest public service informational efforts in the history of these States was undertaken under the supervision of Special Master Lebedoff in an effort to encourage and assist people to file claim forms. Claim forms in Spanish were sent to those areas with a high percentage of Spanish speaking people. Projects were started in civics classes in schools to educate students on how to prepare and fill out their claim form. A claim processing center was established in San Francisco to facilitate the processing of claims.

Since the damage period claimed was 1954 through 1966, the primary question at the outset was how people would establish proof of purchase or even begin to recollect their purchases of broad spectrum antibiotics. To solve this problem, a claim form, "Form A" was developed that did not require proof for purchases under $150.00.

After affirming that he had purchased the drugs in suit during the relevant time periods, the "Form A" claimant was instructed to give other relevant data, including the number of years he lived in the State, number of children and birth dates, driver's license information, etc. Each claimant therefore then knowingly permitted the Court to determine the fair share of his refund.

A total of 980,851 Forms A were filed.

Forms A were checked for fraud and errors. People who did not live in the State during the damage period or who were too young to have purchased drugs during that period were rejected. Forms that were filled out improperly, not signed, etc., were also rejected. In each case of a rejection or reduction, the claimant was notified of his right to appeal to the Special Master.

Those people who felt that their purchases were higher than average, and could submit some type of proof, were later sent a second claim form (Form B). This asked them to describe their purchases in detail and submit proof of their purchases with their form. A total of 122,528 Forms B were sent in. The Forms B were reviewed and audited by a thorough procedure established by a committee of counsel. Through the careful scrutiny of the committee of counsel, claim forms accounting for $72,-021,727.00 in original purchases were reduced or rejected. Every Form B claimant whose claim was reduced or rejected, was notified of his right to a hearing before a Special Master. Many people requested such a hearing. Hearings were held in several different cities. At these hearings claimants were allowed to present any additional evidence and were informed of their right to object to the proposed plan of distribution and allowance and disallowance of claims, if they disagreed with the findings of the Special Masters. These claimants received notice of the May 9th hearing, and that they would be given the opportunity to appear in person or by written submission.

A list of all claimants and the recommended amount of approved pur-

chase dollars is on file with the Court. The Court accepts the recommendation of the committee, and the Special Master, and approves the allowance of claims in the amounts stated.

A total of 885,000 claimants will receive refunds. This represents total claim purchase dollars in the amount of $121,691,831.00.

The above has been a very sketchy review of the great magnitude of work and procedures that went into the claims processing. The Court finds that all claimants were treated with respect and received adequate due process. The Court again commends to the interested the report of the Special Master in regard to the administration of the settlement.

### PLAN OF DISTRIBUTION:

The plan of distribution is on file with the Court. For reasons stated *infra*, the Court will award attorneys' fees from the total of Fund A and Fund C, rather than from each individual State's share of the two funds. Once attorneys fees have been deducted, the fund will be divided into the individual State portions based on settlement percentages. From each State's share, costs of administration and other approved payments from Fund C will be deducted. The cost of administration will be apportioned on the same percentage that each State's total number of claim forms bears to the total number of claims filed. This will leave a net share for each State. From this net share, the payments which are to go to each State's welfare department will be deducted. An appropriate allowance for attorneys fees from these welfare payments will then be deducted from the welfare payments and added back to the net share. This will leave a net-net share for payments to consumers. Each consumer will be paid the same percentage of the net-net share as his approved purchases bear to total approved purchases for that State.

Example:

| Fund A & C | = | Total Fund |
|---|---|---|
| Less Attorneys Fees | | |
| | | Gross Fund |
| Each State receives its settlement portion | = | State Share |
| Less State's apportioned cost of administration and approved payments | = | |
| | | Net Share |
| Less payments to welfare departments | | |
| Plus proportion deducted from welfare for attorneys fees | | |
| AMOUNT TO PAY CONSUMERS | | Net–Net Share |

■ The Court finds the plan of distribution to be not only reasonable but also fair. Since all of the States worked together, both private attorneys and Attorneys General's staff, to create the total settlement, the Court feels that it must deduct attorneys fees from the total fund created rather than from each individual State fund. Each State will be charged for that proportion of the cost of administration which it incurred.

The plan of distribution is approved.

### ATTORNEYS FEES

The Court has received petitions for the allowance of attorneys fees from nine different sources. Four of these petitions are from public sources: the State of California, Office of Attorney General; the State of Oregon, Office of Attorney General; the State of Washington, Office of Attorney General; and the State of Kansas, Office of Attorney General. The other petitions are from private lawyers who have contributed to the overall recovery.

The Court reviewed the relevant law and the standards and methods used in determining attorneys fees in its opinion approving attorneys fees and final plan of distribution in the *Doughboy* settlement *Doughboy Industries Inc. et al. v. American Cyanamid et al.*, 4–68 Civ. 409 (D.Minn. filed December 30, 1968). Since that opinion was handed down about one month ago, the Court will not re-review the law or the standards for determining attorney's fees it is applying in this action. The criteria applied in that case are the same as in this case and the Court adopts that section of the *Doughboy* opinion and incorporates it by reference herein.

The Court does wish to reiterate that it is not awarding attorneys fees for individual attorneys from individual State's funds. Instead, the Court feels that all of these lawyers, whether public or private, worked for the benefit of all the consumers in these actions. Accordingly, to divide the money and then award attorneys fees from each separate State share is not only impractical but unfair. Since all contributed towards the common good, all should be paid out of the common funds. *Lindy Brothers Builders, Inc. v. American Radiator and Standard Sanitary Corporation*, 341 F.Supp. 1077–1082 (E.D.Pa.1972) 487 F.2d 161 (3rd Cir., 1973). *See e. g. State of Illinois v. Harper & Row Publishers, Inc.*, 55 F.R.D. 221 (N.D.Ill.1972); *Norman v. McKee*, 290 F.Supp. 29 (N.D.Cal. 1968).

Each fee application and request for reimbursement of out-of-pocket expenses incurred was accompanied by complete and thorough affidavits, time records, etc. The Court is also personally familiar with the quality of work done by these lawyers, as well as their reputations and standing at the bar.

■ Listed below is a discussion of each fee application, the amount awarded, and the basis upon which the Court has made such an award.

1. Crane, Martin, Claussen, Hamilton & Barry; Donald Barry:

Crane, Martin, Claussen, Hamilton & Barry (the Barry firm) has submitted a fee application requesting the Court to award it reasonable attorneys fees for the work of Donald Barry, Esq. The Barry firm's fee application shows 11,700 total hours devoted to this litigation. 500 hours of these are para-legal time and 1,700 hours are for settlement administration time. The Court recognizes that most of Mr. Barry's settlement administration time was contributed to the *Doughboy* case and as a result will not take that time into account for this award. As in the case with *Doughboy*, the Court sets an hourly rate for Mr. Barry of $100.00 an hour. Mr. Barry is a fine and valuable lawyer. His standing and reputation at the local and national bar are well known. He was a valuable asset to this case and was an excellent advocate for the consumers of the State of Kansas. After deducting the hours spent on settlement administration in the *Doughboy* case and setting an hourly rate of $20.00 per hour for para-legal time, the total fee computation to which a risk factor is to be applied equals $960,000.00. In assessing a risk factor for Mr. Barry, the Court uses 1.5. Applying a 1.5 risk factor, the award becomes $1,440,000.00. From $1,440,000.00 the Court subtracts the fees earned by Mr. Barry in the *Doughboy* case and also fees received from retained clients in the *Doughboy* case. After subtracting appropriate amounts for these two factors, the Court arrives at a fee award of $650,000.00 from the consumer class actions. The Court finds that the fee award of $650,000.00 is fair and reasonable.

2. Ferguson & Burdell; Thomas G. Greenan:

Ferguson & Burdell (the Greenan firm) has requested that the Court award it a reasonable attorneys fee from these consumer class actions. The Greenan firm has filed an application

stating a total in excess of 13,076 hours for work in all of the antibiotics anti-trust litigation. Mr. Greenan and the other members of the Greenan firm are well known throughout the United States for their work in both plaintiffs' and defendants' anti-trust litigation. As this Court noted in its *Doughboy* opinion, "It is impossible to state with any degree of clarity the amount of contribution which Mr. Greenan and his firm have contributed to all of the antibiotics cases. Suffice it to say that he was one of the primary movers in this litigation, in both the human consumption and in the *Doughboy* actions." The Greenan firm also contributed the services of Mrs. Sharon Haggerty on an almost full-time basis during the administration. Her contributions to the settlement administration were tremendous and greatly appreciated by the Special Masters and the Court. The Court, applying the minimum hourly rate of $100.00 per hour for Mr. Greenan, arrives at $1,307,600.00. Using again a risk multiple of 1.5 results in a total fee computation of $1,961,-400.00. From this amount the Court must deduct fees received in the *Doughboy* action and other fees received in the antibiotics anti-trust litigation. Another reducing factor is the amount of para-legal time used by Mr. Greenan's firm. The Court is thus deducting a total of $840,000.00 from the fee computation for Mr. Greenan's firm. This leaves a total fee award from the consumer actions of $1,120,400.00. The Court finds this fee to be fair and reasonable.

3. Joseph L. Alioto & Guido Saveri; Guido Saveri:

Guido Saveri, Esq., representing both the States of Utah and Hawaii has filed an application requesting that the Court award him a reasonable attorney fee from the consumer settlements. Mr. Saveri's supplemental affidavit shows a total of 4,179 hours in pursuit of the consumer and *Doughboy* litigations. These hours do not include hours devoted to the cases currently before the Court in trial.

Mr. Saveri's contributions in this case have been significant, particularly in the areas of settlement. His standing and reputation at the bar are well known. He has represented the consumers well.

The Court again applies an hourly rate of $100.00 for Mr. Saveri's time. This equals a total hourly award of $417,-900.00. Applying a risk factor multiple of 1.5, the Court arrives at a total fee computation of $626,850.00. From that amount, the Court deducts the award received in the *Doughboy* case. This leaves a total fee award to Mr. Saveri from the consumer cases of $540,000.00. The Court finds that this fee award is fair and reasonable.

4. Louis M. March, Esquire:

Louis M. March, of Chicago, Illinois, has filed a fee application in these cases requesting that the Court award him a fee in the amount of $20,000.00. Mr. March represents the plaintiff Marvin Barkal. During the early portions of this litigation, Mr. March moved the Court to name Marvin Barkal as a class representative for all of the consumers in the United States. This motion was denied. Mr. March, however, was instrumental in raising certain pertinent issues before Judge Wyatt and in the other States' settlements.

For reasons having to do with their disparate view of the manner in which these cases should be handled, Mr. March, although assigned to the Committee of Counsel as a member, did not participate with them in their work. He was, however, present at numerous pre-trials and conferences and traveled throughout the country in his efforts to aid the classes herein involved.

The Court finds that an attorney's fee in the amount of $20,000.00 is fair and reasonable and therefore awards Louis M. March the same.

5. Paul D. Scanlon, Esquire:

Mr. Paul D. Scanlon has submitted a petition requesting a reasonable attorneys fee from the Court. Mr. Scanlon, at one time, was appointed to represent

the interests of hospital patients in these actions. He did an outstanding job in that endeavor.

Although the Court ultimately dismissed hospital patients as a separate class, they are covered in this settlement. Mr. Scanlon's work helped to narrow the issues and lay a foundation which ultimately benefited not only hospital patients but all members of this class.

Mr. Scanlon's standing and reputation at the bar are excellent as was the legal work he performed. His application states a total of 1,000 hours. Applying an hourly rate of $100.00 per hour, the Court arrives at $100,000.00. With a risk factor multiple of 1.5 this equals a total fee computation of $150,000.00. The Court finds $150,000.00 to be a fair and reasonable award.

This concludes the fee applications and awards from the private attorneys. The fee applications and fee awards of the public attorneys will be discussed *infra.* The Court wishes to emphasize that the role of both private and public attorneys has been substantial in this case. The Court feels that these particular private attorneys have fulfilled their role as private attorneys general in a very able and capable fashion. They are to be encouraged as are all private attorneys in representing the offices of the Attorneys General for their particular State in such a credible and professional manner.

The Court also recognizes the great contribution by the public attorneys in the States of California and Oregon. Had California decided to accept the original New York settlement offer or had California not insisted that the County of Los Angeles and City and County of San Francisco remain in this litigation, it is doubtful that the amounts of money received by any State would have been nearly so great. California's contributions in the economic field have already been discussed. The lawyers in the Attorney General's office of the State of California represented California very competently, ably and as well as any private lawyer might have. Mr. Speigel and Mr. Murphy, of the State of California Attorney General's office, have done an outstanding job throughout this litigation. The Court has the highest esteem for these men as individuals and as litigants.

The same must be said of the State of Oregon. The Attorney General's office has done an excellent job in representing its consumers. Mr. Stephen Dunne, and before him Mr. Ed Nugent, have taken an active and able role in the litigation. The State of Oregon also has employed very capable para-legals to assist it where possible. Oregon's contributions to these cases have been significant. These public lawyers have represented their State as well as any private litigant.

Accordingly, the Court is going to award fees to both the Attorney General of the State of California and to the Attorney General of the State of Oregon as if they were private lawyers. In so doing, the Court does not wish to discourage the use of private attorneys to represent States' Attorneys General in actions such as these. With the exception of California, Oregon and a few other States, most Attorneys General's offices are not sufficiently staffed to bring these types of actions. When staffing is available and funds are available, the risk of political intervention through the restraining of funds by the Legislature is always great. What was an Attorney General's anti-trust staff one day may be abrogated by an irate State legislator on the next. The plan here implemented affords the various Attorneys General an option as to how they might handle their class action cases. In the event that they choose to proceed without retaining private counsel, the prospect of their recovery of substantial attorneys' fees will reassure those involved in the state budget process that such funds may be ultimately recovered for the state itself. On the other hand, in those instances where such funds cannot be obtained by the states, the retention of private counsel is still a viable option. The plan gives to the Attorney General that freedom from political pressures which is desirable under these circumstances.

To California's and Oregon's credit, their States have not chosen to act irresponsibly in this area. The lawyers have been well funded, are very experienced, and have taken an active and strong role in this litigation. The consumers of these two States, as well as their Attorneys General, can be proud of their staffs' fine performance. The Court would encourage this type of conduct on behalf of these Attorneys General in the future.

The Court is also making an award to the Attorney General of the State of Washington. The Attorney General has filed an application requesting a small fee for the work done directly by his staff.

The Attorney General of the State of Kansas has filed for a statutory ten percent award out of the monies to be returned to the consumers of the State of Kansas. The Court denies this award at this time.

Each fee application and the amounts awarded are listed below:

1.  *State of California.*

The State of California has filed an application requesting a reasonable attorneys fee from the consumer class. The contributions of the State of California have been discussed above. In computing the State of California's award, the Court is assessing 14,472 hours of time at one risk factor and 6,128 hours of lawyers' time at a second risk factor. Applying the hourly rate of $100.00 an hour to the first 14,472 hours, the Court arrives at an hourly rate of $1,447,200.00. Applying a risk factor of 2 to this rate, the Court arrives at a total fee computation for this portion of the hours of $2,894,400.00. The Court is using a higher risk factor for these early hours because of the tremendous early contributions of the State of California. This includes the great amount of time spent by the State of California in preparing its early economic briefs and also its great amount of time in pursuit of this litigation. The Court feels that a risk factor of 2 for these early hours is most

reasonable. After using a risk factor of 2 for the original 14,472 hours, the Court applies a $100.00 rate to the remaining 6,128 hours. This equals $612,800. Applying a risk factor multiple of 1.5 equals $919,200.00 as a fee computation for this portion. To that figure, the Court adds $24,680.00 for para-legal time. This equals a total fee award of $3,838,280.00. The Court feels that this fee award is fair and reasonable.

2.  *State of Oregon.*

The State of Oregon also has filed a petition seeking reasonable attorneys fees. The contributions of the State of Oregon were discussed above and are great. The Oregon application states a total of 6,432.5 hours total time upon these actions. This time is divided into 3,143.5 hours attorneys time and 3,389 hours para-legal time. Applying a multiple of $100.00 an hour to the lawyers time results in a total attorneys charge of $314,350.00. Applying a $20.00 an hour rate for para-legal time results in a total of $67,780.00. This combined total is $382,130.00. Applying the contingency factor of 1.5, the Court arrives at a fee computation of $573,195.00. From this must be deducted a fee award of $70,-195.00 to the State of Oregon from the *Doughboy* settlement. This leaves a total fee award of $503,000.00 from the consumers. The Court finds that this fee is fair and reasonable.

3.  *Attorney General of the State of Washington.*

The Attorney General of the State of Washington has made an application for an award of fees for work done directly by members of his staff in these cases. The majority of this work was done by lawyers in the Attorney General's office in the settlement distribution. Members of this Attorney General's office spent many hours assisting in auditing the consumer claims and in preparation for hearings. These hours were spent on claims for all of the States and the Court feels that an award of $80,000.00 is a fair and reasonable award for this service.

4. *Attorney General of the State of Kansas.*

As stated above, the Attorney General of the State of Kansas has filed a petition for a statutory fee of ten percent of the amount awarded to the consumers in the State of Kansas. The Court denies this request at this time. The Court does, however, note that the Attorney General may apply for this fee out of any unused funds from the Kansas share after the monies are distributed. The Court will reconsider this application at that time.

### WELFARE PAYMENTS:

The settlement agreements call for the payment of certain amounts to the State Welfare Departments of each settling State as reimbursement for purchases made by them. The amount applied to each State is listed below. The Court is also charging each State's Welfare Department twenty percent for attorneys fees. Without such a charge, the Welfare Departments would not be paying any attorneys fees at all. The twenty percent charged to Welfare will be added back to the monies to be refunded to the consumers in each State. Below are the amounts to be paid in each State to the Welfare Departments, the amount to be deducted from attorneys fees, and the net amount to be paid to each Welfare Department:

California:

| | |
|---|---|
| Total Welfare Settlement Amount: | $1,956,000.00 |
| Less Attorneys Fees: | $ 391,200.00 |
| Total to be Paid to Welfare Departments: | $1,564,800.00 |

Washington:

| | |
|---|---|
| Total Welfare Settlement Amount: | $ 279,000.00 |
| Less Attorneys Fees: | $ 55,800.00 |
| Total to be Paid to Welfare Departments: | $ 223,200.00 |

Kansas:

| | |
|---|---|
| Total Welfare Settlement Amount: | $ 213,000.00 |
| Less Attorneys Fees: | $ 42,600.00 |
| Total to be Paid to Welfare Departments: | $ 170,400.00 |

Oregon:

| | |
|---|---|
| Total Welfare Settlement Amount: | $ 78,000.00 |
| Less Attorneys Fees: | $ 15,600.00 |
| Total to be Paid to Welfare Departments: | $ 62,400.00 |

Utah:

| | |
|---|---|
| Total Welfare Settlement Amount: | $ 44,085.00 |
| Less Attorneys Fees: | $ 8,817.00 |
| Total to be Paid to Welfare Departments: | $ 35,268.00 |

Hawaii:

| | |
|---|---|
| Total Welfare Settlement Amount: | $ 7,000.00 |
| Less Attorneys Fees: | $ 1,400.00 |
| Total to be Paid to Welfare Departments: | $ 5,600.00 |

As stated above, the original amounts for Welfare payments were in the settlement agreement and were based on the original Alabama plan. Since these amounts would not have been obtained without the benefit of the consumers, the Court feels that an attorneys fee based upon the same percentage as the attorneys fees to the overall class is eminently fair and reasonable. The lawyers will not be receiving this fee; it will be added back to the total amount to be paid to consumers.

### COUNTY OF LOS ANGELES AND CITY AND COUNTY OF SAN FRANCISCO:

As the Court discussed briefly *supra*, there is a special settlement within the State of California for the City and County of San Francisco and the County of Los Angeles. The State of California opposed the early action taken by San Francisco and Los Angeles in accepting their share of the original $100,000,000.00 global settlement on the grounds that the Attorney General was the only proper Rule 23 class representative for citizens of California and that political subdivisions cannot separately settle on behalf of some citizens while the remainder of the citizens of the State of California continue to litigate. The question was on appeal before the Court of Appeals for the 2nd Circuit when a compromise

was reached whereby San Francisco and Los Angeles agreed to withdraw from the settlement and permit the Attorney General to litigate on behalf of all California citizens. San Francisco and Los Angeles themselves would continue to litigate on account of their institutional purchases. The State on its part agreed to dismiss its appeal and to pay San Francisco and Los Angeles $378,000.00 and $1,500,000.00 respectively at the conclusion of the litigation. The Court has at all times been fully apprised of this situation and the terms of this settlement were disclosed to all of the citizens of California in the class action notice dated October 31, 1973 advising them of the proposed settlement. As a result of this, before the California proceeds can be distributed to California consumers, monies must be deducted for payment to the City and County of San Francisco and the County of Los Angeles. A major portion of these funds were paid from the institutional settlement funds. The amount remaining due the City and County of San Francisco is $87,793.19. The amount due Los Angeles is $349,329.20. From these amounts, the Court is deducting twenty percent for attorneys fees. Thus, $69,865.84 will be deducted from the amount going to the County of Los Angeles, leaving a balance to be paid to the County of Los Angeles of $279,463.36. $17,558.63 will be deducted from the amount going to the City and County of San Francisco, leaving a balance of $70,234.56 to be paid to the City and County of San Francisco.

Once again, the attorneys fees deducted from these two entities will not be paid to the attorneys but will be put back into the amount of funds going to the consumers.

## COSTS:

As stated in the plan of distribution, all out-of-pocket expenses and costs will be either charged as incurred by each State or as pro rated for each State based upon the number of claim forms filed. There is one exception to this. $400,000.00 of California's cost for developing the economic brief will be distributed pro rata among the other States. This is pursuant to the suggestion of the Court and the agreement by all of the parties. The cost for the development of the original economic brief exceeds $800,000.00 for outside expenses alone. Pursuant to agreement, and because of the heavy reliance upon the economic brief by the other States, $400,000.00 of this cost will be distributed among the five other states who were direct beneficiaries of this economic brief.

Applications have been filed for reimbursement of out-of-pocket expenses by the lawyers or Attorneys General in all of the States. The Court is also setting aside $750,000.00 for future administrative costs which will be pro rated by number of claims filed. All other expenses have been paid from Fund C pursuant to order of this Court.

Listed below are the approved out-of-pocket reimbursements, allocation of future administrative costs, and allocated charge for the California economic brief for each State:

California:

| | |
|---|---|
| (a) Out-of-Pocket Expenses Payable to Attorney General, State of California | $ 326,794.00 |
| (b) Future Administrative Expenses | $ 570,922.35 |

Washington:

| | |
|---|---|
| (a) Out-of-Pocket Expenses Payable to Ferguson & Burdell | $ 9,333.37 |
| Payable to Attorney General, State of Washington | $ 8,128.18 |
| (b) Future Administrative Expenses | $ 60,178.12 |
| (c) California Economic Brief | $ 150,682.00 |

Kansas:

| | |
|---|---|
| (a) Out-of-Pocket Expenses Payable to Donald Barry | $ 4,050.76 |
| (b) Future Administrative Expenses | $ 48,377.40 |
| (c) California Economic Brief | $ 121,166.00 |

Oregon:

| | |
|---|---|
| (a) Out-of-Pocket Expenses Payable to Attorney General, State of Oregon | $ 9,768.46 |
| (b) Future Administrative Expenses | $ 47,165.40 |
| (c) California Economic Brief | $ 77,222.00 |

Utah:

| | | |
|---|---|---|
| (a) Out-of-Pocket Expenses Payable to Guido Saveri, Esquire | $ | 32,279.26 |
| (b) Future Administrative Expenses | $ | 21,487.20 |
| (c) California Economic Brief | $ | 44,085.00 |

Hawaii:

| | | |
|---|---|---|
| (a) Out-of-Pocket Expenses Payable to Guido Saveri | $ | 8,127.24 |
| (b) Future Administrative Expenses | $ | 1,869.53 |
| (c) California Economic Brief | $ | 6,845.00 |

In addition, each State owes certain funds to the United States Postal Service for the original class action notices mailed in 1971. These were franked notices which were not paid at the time. It has always been agreed that if the States ever recovered monies in these actions the postage was to be paid from these funds. Each State is listed below and the amount which will be paid to the United States Postal Service for this 1971 postage.

| | |
|---|---|
| California | $251,002.00 |
| Washington | $ 47,910.00 |
| Kansas | $ 33,865.00 |
| Oregon | $ 28,367.00 |
| Utah | $ 12,895.00 |
| Hawaii | $ 1,634.00 |

The Court is also awarding out-of-pocket expenses to Louis March, Esquire in the amount of $6,500.00. Such amount will be deducted from the total fund.

The Court finds that all of the expenses are reasonable, necessary, and/or pursuant to agreement. The Court is satisfied that future administrative costs in the amount of $750,000.00 will be necessary. The majority of the remaining expenses will be computer bills and for the printing and mailing of approximately 1,000,000 checks to the consumers.

### CONCLUSION:

The recommended allowance and disallowance of claims is approved. The recommended plan of distribution is approved. Attorneys fees and out-of-pocket expenses are approved as stated above. Future administrative expenses are approved in the amount of $750,-000.00.

In approving the plan of distribution and allowance and disallowance of claims, the Court takes note of the ongoing argument on manageability of fluid class actions. The Court has been hearing for years that this type of settlement, and this type of class action, are unmanageable and will not work. It has strenuously been argued for years that the consumers were not interested in such litigation and that they would not come forward to "lay claim" to the proceeds. At the hearing to approve the fairness and adequacy of this settlement counsel for the defendants suggested that a distribution of such magnitude was not manageable

If, for example, California can come into Court against us with the weight of possibly 10,000,000 purchasers, and in fact it turns out that the active, interested members of the class consist of 30,000 or 40,000 people, it seems to me that the author ought to consider the question of public policy of whether the scales of the adversary contest have not been unfairly weighted on the side of the plaintiff in that sort of suit. The real hard question between us, I think, and these negotiations and the question that kept us, at least this defense counsel, awake at night was not trying to assess the odds on liability, that lawyers do all of the time, but this great unknown mass of consumers. T. p. 51, February 13, 1974; 4–71 Civ. 435, 4–71 Civ. 392, et al.

This prediction of 30,000 or 40,000 consumers has been proven wrong. The question was removed from the arena of judges', lawyers' and scholars' minds and put to the test in the only practical way possible. The consumers themselves were asked to come forward and express their interest. Instead of 30,000 or 40,-000; nearly 1,000,000 showed their interest by filing a claim. Claims were filed even though the amount to be recovered was small and known to be small. Speculation and conjecture need no longer cloud our thoughts on this question. The consumer is in fact interested. Fluid class actions on behalf of consumers insofar as the interest of the class is

concerned are as viable and "real" as any other type of litigation and should be treated accordingly.

With the use of computers and the other disciplines, along with the assistance of very capable lawyers, this class action has proven to be not only manageable but a great benefit to the consumers involved. The Court again states that this case has always been and continues to be manageable.

Defense counsel as well as plaintiffs counsel are to be commended for their cooperation and diligence. The role of the United States government attorneys and counsel for International Rectifier Corporation, a competitor, also contributed to the result.