[S.F. No. 24699. Mar. 20, 1986.]

THE STATE OF CALIFORNIA, Plaintiff and Respondent, v.
LEVI STRAUSS & CO., Defendant and Respondent;
HANNAH KERNER, Intervener and Appellant.

**COUNSEL**

Anita P. Arriola, Robert L. Gnaizda, Gary J. Near and Oliver Jones for Intervener and Appellant.

Carlyle W. Hall, Jr., Bill Lann Lee and Marilyn O. Tesauro as Amici Curiae on behalf of Intervener and Appellant.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Sanford N. Gruskin, Assistant Attorney General, Peter K. Shack and Owen Lee Kwong, Deputy Attorneys General, for Plaintiff and Respondent.

M. Laurence Popofsky, Robert J. Vizas, Jessica S. Pers and Heller, Ehrman, White & McAuliffe for Defendant and Respondent.

## OPINION

**BIRD, C. J.**—This court granted a hearing in this case primarily to consider the appropriate methods for distributing damages in consumer class actions. That issue arose as an aspect of intervener's appeal from the superior court's approval of a class action settlement. As will appear below, it is now clear that as a result of the passage of time and changes in the position of intervener no practical purpose would be served by invalidating the settlement of this six-year-old class action.

However, a sizable residue has developed in the intervening period, consisting of damages due to claimants who can no longer be located and interest on those damages. This residue remains unallocated under the settlement approved by the trial court. Today's ruling will serve as a source of guidance both for the trial court on remand in allocating the residue and for other courts in confronting the largely uncharted area of fluid recovery. Therefore, it is appropriate to address the damage distribution issue on which hearing was granted.

I.

Intervener appeals from the superior court's approval of a class action settlement. The settlement purports to resolve the widely publicized antitrust action brought by the Attorney General on behalf of the state and consumers against Levi Strauss & Co., a clothing manufacturer. The action sought monetary relief for millions of consumers who were assertedly overcharged on jeans purchased during the early 1970's.

As finally approved, the settlement yielded between 35 and 40 cents per pair of jeans, an average individual recovery of $2.60-$3. The Attorney General's office was awarded $1.2 million in attorney fees, and the costs of administration were estimated at $1.8-$2.2 million. The total amount allocated to consumers was approximately $9.3 million. This amount, plus ac-

cumulated interest, is currently deposited with the state pending the outcome of this appeal.

Intervener, along with 19 objectors,[1] challenged both the fairness of the process which led to the settlement and the fairness and reasonableness of the outcome. First, she questioned the settlement's plan for distributing the money to individual consumers. She argued that the court erred in approving the distribution of class funds on the basis of claims nearly 95 percent of which were unsworn and unverified. She also suggested that the individual recoveries are trivial and where—as here—there is no feasible method for verifying the overwhelming majority of claims, an aggregate remedy such as the establishment of a consumer trust fund should be preferred.

Second, intervener maintained that the trial court failed to provide adequate means for dissenting class members to participate and express their preferences. Specifically, she argued that the court denied her attempts to discover the factual and economic basis of the settlement, placed obstacles in the way of participation by objectors, failed to file or respond to the over 300 objections that were submitted, denied her a modest sum to conduct a poll of class preferences, and approved a nonneutral class notice that promoted the settlement and failed to provide information essential to an intelligent choice.

The facts are set forth in detail below.

On May 5, 1976, after an extensive investigation, the Federal Trade Commission (the Commission) issued an administrative complaint against Levi Strauss & Co. The complaint charged the company with pressuring retailers to maintain high prices in violation of federal antitrust law.

In late 1977, the Commission and the company entered into a consent decree. By the terms of the decree, the company agreed to cease all efforts to control retail pricing.

Some time later, the then Attorney General, Evelle Younger, obtained the results of the Commission's investigation and began his own inquiry into the impact of the company's activities on California consumers. On the basis of the information thus acquired, he tentatively decided to bring suit alleging

---

[1]Intervener's attorneys represent eight organizational and eleven individual objectors. The organizational objectors are the American G.I. Forum, Chinese for Affirmative Action, Glide Memorial Methodist Church, League of United Latin American Citizens, Los Padrinos, Mexican American Political Association, National Association for the Advancement of Colored People—Western Region, and Oakland Citizens Committee for Urban Renewal.

violations of the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.),[2] California's antitrust law. He informed the company of his intent and began negotiations for a settlement.

Between March and June of 1978, the Attorney General and Levi Strauss negotiated their first proposed settlement in the amount of $3.5 million. The settlement provided that the money be distributed to individuals on a pro-rata basis according to the number of pairs of men's and boys' jeans purchased during the period 1972-1975.

In June of 1978, the state, represented by the Attorney General, commenced this action in the superior court, both as a class action on behalf of itself and similarly situated consumers (Code Civ. Proc., § 382) and as a suit *in parens patriae* on behalf of its residents (§ 16760). At the same time, the Attorney General notified the court of the proposed settlement.

Shortly afterward, a number of prospective interveners including Hannah Kerner, the present named intervener, learned of the proposed settlement and filed a declaration in opposition. It argued that individual distribution would produce only small individual returns and that, without prohibitively expensive security measures, a large percentage of the fund would be distributed to persons who did not in fact purchase jeans during the relevant period. It also averred that the requirement of written claim forms would discourage low income and minority members of the class from claiming and receiving their fair share of the recovery.

As an alternative to individual distribution, interveners' declaration proposed that the settlement money be used to establish a nonprofit corporation which would administer a "consumer trust fund." This corporation would engage in consumer protection projects, including research and litigation. It would be controlled by a board of nine directors, five appointed by the Governor and four by the Attorney General. The corporation would be organized so that it could receive funds from future class action settlements.

The court granted leave to intervene.

In the early fall of 1978, the Attorney General and the company had a dispute over the accuracy of the sales figures used as a basis for the proposed settlement. As a result, the proposed settlement was abandoned and the Attorney General commenced discovery.

In January of 1980, then Attorney General George Deukmejian moved to certify a class consisting of all current California residents who purchased

---

[2]Unless otherwise noted, all statutory references are to the Business and Professions Code.

Levi Strauss products at retail during the 1972-1975 period. At various times, the Attorney General estimated that this class consisted of from several to 7 million households.

While the class certification motion was under consideration by the court, the Attorney General and the company negotiated what might be called a "gamble" agreement. This agreement provided that if the requested class or a specified variant were certified, the company would pay $12.5 million. However, if the class were not certified, the company would pay $5.5 million.

In July of 1980, the court certified the class as requested. Shortly thereafter, the Attorney General and the company informed the court of the second proposed settlement, which—like the first—provided for individual distribution. Costs of distribution were projected to be as high as $2.2 million. In addition, the Attorney General's office was to receive an attorney's fee of $1.2 million.

The court determined that the new proposed settlement merited consideration and granted the Attorney General $75,000 from the settlement fund to prepare a plan of distribution.

Intervener reasserted her objections to an individual distribution plan and averred that a substantial percentage, if not a majority, of the class shared her views. She moved for $12,000 to enable her to conduct a survey of class preferences and to study ways to prevent fraud and to encourage participation by minority and low income class members. This motion was denied pending the development of the Attorney General's plan.

In November of 1980, the Attorney General submitted his plan of distribution. It provided for individual notices, printed in English and Spanish, to be mailed to 8.6 million households. An additional 3.4 million notices were to be made available at various pickup centers around the state.

The legal notice of settlement, which set forth the terms of the agreement and the options available to class members, was sandwiched between an introductory letter, signed by the Attorney General, and a claim form for those class members who desired to participate in the settlement. The Attorney General's letter, labeled "Cash Refund Notice," urged eligible consumers to claim their cash refunds by returning the enclosed claim form. It stated that the Attorney General "has settled" the action and that purchasers "are now eligible for a cash refund of up to $2.00 per pair." It did not mention the legal requirement that the court approve.

The notice was to be mailed in a folded cover instead of an envelope. The proposed design of this cover is depicted below.[3]

The plan provided for a two-week campaign of television and radio advertising to be aired in conjunction with the mailing of notices. This campaign, which featured personal appearances by the Attorney General, was to be organized around the pocket-and-bills logo so that recipients of the mailed notice could distinguish it from commercial bulk mailings.

The plan gave consumers six weeks from the start of the mailing process to return their claim forms and/or objections or to opt out of the settlement. No verification of purchase was required, but claims were to be analyzed according to unspecified "fraud tests."

Intervener reasserted her objections to the individual distribution plan. In addition, she charged that the notice and media campaign improperly provided free political exposure for then Attorney General Deukmejian.

A short time thereafter, the Attorney General proposed revisions to the notice, including deletion of the "POCKET MONEY" slogan on the cover. At the same time, he informed the court that he would seek an entertainment industry figure to replace him in the media campaign.

In January of 1981, the court approved the distribution plan, including the notice as revised by the Attorney General. A hearing on the fairness of

---

[3]Substantially reduced, the proposed cover appeared as depicted:

**FRONT COVER**          **BACK COVER**

the settlement was set for April 27, 1981. The Attorney General was granted $1.2 million out of the settlement fund to cover preliminary expenses.

Beginning February 21, notices were mailed to 8.6 million households. An additional 1.5 million forms were made available at post offices. The media campaign ran simultaneously with Michael Landon replacing the Attorney General in the television commercials.

As finally approved, the notice was labeled "Notice of Cash Refund" on its address cover. The back cover contained the language: "STATE OF CALIFORNIA, Attorney General's Office; Consumer Cash Refund; You May Be Eligible For A Cash Refund From The State of California; Please Read The Attached Notice Carefully." The record does not reveal the final graphic design of the cover. The introductory letter was unchanged from the original proposed notice.[4]

By April 6, the deadline for responding to the notice, 1.4 million forms claiming 37 million pairs of jeans had been received. Between 345 and 510 objections were submitted,[5] and 111 exclusions were filed. The objections were never made part of the record.

According to the Attorney General, 24 percent of the claims alleged 10 or more purchases per individual during the 5-year period. Twelve percent claimed more than 15 purchases, 5 percent more than 21, and 1 percent more than 35.

The Attorney General recommended that the top 1 percent of the claims be treated as suspect.[6] Each person submitting a suspect claim would be required to submit a notarized confirmation that the information contained

---

[4]The cover letter, signed by then Attorney General Deukmejian, read as follows:
"Cash Refund Notice
"Dear Californian,
    "As Attorney General of the State of California, I am pleased to inform you that my office has settled a lawsuit on your behalf, involving the price practices of Levi Strauss & Co. If you or any member of your household purchased Levi's men's and boys' denim or corduroy jeans between January 1, 1972 and December 31, 1976, you are now eligible for a cash refund of up to $2.00 per pair. In most cases, no proof of purchases will be required. This is your claim form. Please read the simple instructions, fill it out and mail it back to us. I urge you to claim your cash and refund now.
                              "Most Cordially,
                              (Signature)"
    [5]Television station "KPIX" filed objections on behalf of 155-165 persons. The Attorney General maintains that these objections were not submitted in compliance with the terms of the notice. Because the trial court did not include in the record any objections other than intervener's, this court is unable to judge the merits of the Attorney General's argument.
    [6]Claims submitted by households of more than 12 persons, a much smaller proportion of the total claims, were also to be deemed suspect.

in the claim was accurate. Failure to do so would result in denial of compensation.

The fairness hearing was held as scheduled on April 27. Plaintiff, defendant, and intervener each argued their positions concerning the fairness of the settlement. An undetermined number of objectors also attended but did not testify. From the record, it appears that the court neither prohibited nor solicited their participation.

Prior to the hearing, both plaintiff and intervener had moved for attorney fees, plaintiff for $1.2 million and intervener for $120,000. However, these motions were not discussed at the hearing. Instead, by agreement of the parties and the court, the question of attorney fees was postponed to a second hearing.

On May 15, the trial court approved the settlement. It ordered that the top 5 percent of claims (more than 21 pairs of jeans per individual) be treated as suspect. It also granted the Attorney General's motion for attorney fees and denied intervener's. The promised hearing on the question of attorney fees was never held.

In early November, the state issued a progress report on claims processing. Pursuant to the court's order designating the top 5 percent of claims as suspect, over 75,000 claims had been returned with instructions to resubmit with a notarized statement confirming their veracity. Over 80 percent of these claims were not resubmitted. A similar percentage of claims returned as suspect because of excessive household membership (over 12 individual claimants) were not resubmitted. In all, over $1.6 million in suspect claims were eliminated.

Pursuant to intervener's request for findings of fact and conclusions of law, the state submitted proposed findings. Intervener responded with numerous objections. On November 16, 1981, the court entered its final judgment, adopting verbatim plaintiff's proposed findings.

## II.

The course of events described above presents this court with a difficult problem. Nearly $1.5 million of the settlement fund has already been spent on the present distribution plan. Intervener criticizes this expenditure, but does not contend that reversal would somehow restore the funds. Further, over 1 million household claims have been received and processed, thereby inducing legitimate expectations of compensation among class members. Intervener remains critical of this method of distribution to individual con-

sumers on the basis of largely unverified claims. Nonetheless, at oral argument, intervener joined amici Consumers Union et al. in urging that—with some additional security precautions—these claims be honored. However, this court can preserve the present claims only by upholding the settlement. ■ (See *Trotsky* v. *Los Angeles Fed. Sav. & Loan Assn.* (1975) 48 Cal.App.3d 134, 153 [121 Cal.Rptr. 637], [a settlement must be approved or rejected as a whole since it is impossible to determine whether the parties considered the different portions of the agreement to be interdependent].) In view of the concessions made by intervener at oral argument, it would serve no practical purpose to invalidate the settlement in this six-year-old class action.

In a sense, this court is confronted with a fait accompli. The only effective means to prevent further expenditures of class funds and to vindicate the claimants' current expectations—ends desired by all the parties—is to affirm the settlement.

Indeed, it appears that intervener and amici are principally concerned not with reversing the settlement, but with advocating a particular use for the residue remaining after individual distribution. They estimate that this residue will be substantial since the settlement fund has accumulated considerable interest and since many claimants can no longer be located. Intervener and amici have devoted their principal efforts to arguing that this sum should be used to establish a "consumer trust fund." Their proposal is entirely consistent with affirmance.

### III.

■ Since the pathbreaking case of *Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513], the California courts have recognized that the consumer class action is an essential tool for the protection of consumers against exploitative business practices. The *Vasquez* decision challenged the trial courts to develop "pragmatic procedural devices" to "simplify the potentially complex litigation while at the same time protecting the rights of all the parties." (*Id.,* at p. 820; cf. *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588, 610 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061], cert. den. 449 U.S. 912 [66 L.Ed.2d 140, 101 S.Ct. 285, 101 S.Ct. 286] [courts must fashion consumer class action remedies to meet the changing needs of modern industrial society].)

Damage distribution, the crux of the present case, poses special problems in consumer class actions. Often, proof of individual damages by competent evidence is not feasible. Each individual's recovery may be too small to

make traditional methods of proof worthwhile. In addition, consumers are not likely to retain records of small purchases for long periods of time.

In response to these problems, the courts have turned to the equitable doctrine of *cy près*. This doctrine originated in the law of charitable trusts. Where compliance with the literal terms of a charitable trust became impossible, the funds would be put to "the next best use," in accord with the dominant charitable purposes of the donor. (See *Estate of Tarrant* (1951) 38 Cal.2d 42, 49 [237 P.2d 505, 28 A.L.R.2d 419], and cases cited.) ■ In the class action context, the *cy près* doctrine is generally denominated "fluid recovery."

■ The propriety of fluid recovery in a particular case depends upon its usefulness in fulfilling the purposes of the underlying cause of action. (*Bruno v. Superior Court* (1981) 127 Cal.App.3d 120, 129 [179 Cal.Rptr. 342] [hereafter *Bruno*], citing *Simer v. Rios* (7th Cir. 1981) 661 F.2d 655, 676; *Blue Chip Stamps v. Superior Court* (1976) 18 Cal.3d 381, 389 [134 Cal.Rptr. 393, 556 P.2d 755] (conc. opn. of Tobriner, J.).) Fluid recovery may be essential to ensure that the policies of disgorgement or deterrence are realized. (*Simer v. Rios, supra,* 661 F.2d at p. 676.) Without fluid recovery, defendants may be permitted to retain ill gotten gains simply because their conduct harmed large numbers of people in small amounts instead of small numbers of people in large amounts.

■ The parties do not dispute that fluid recovery methods may be employed in appropriate Cartwright Act cases. (See *Bruno, supra,* 127 Cal.App.3d at p. 132.) As the *Bruno* court pointed out, the purposes of the private damages action for violations of the Cartwright Act include disgorgement and deterrence as well as compensation. (*Id.,* at pp. 132-133.)[7]

■ The implementation of fluid recovery involves three steps. (See generally, Malina, *Fluid Class Recovery as a Consumer Remedy in Antitrust Cases* (1972) 47 N.Y.U. L.Rev. 477, 482.) First, the defendant's total damage liability is paid over to a class fund. Second, individual class members are afforded an opportunity to collect their individual shares by proving their particular damages, usually according to a lowered standard of proof. Third, any residue remaining after individual claims have been paid is dis-

---

[7]The concurring and dissenting opinion concedes that fluid recovery may be employed in an appropriate Cartwright Act case. (See conc. & dis. opn., *post,* at pp. 489-490.) The concurring and dissenting opinion also implicitly approves two other aspects of the *Bruno* opinion: the rejection of federal precedents holding fluid recovery to be unlawful (*Bruno, supra,* 127 Cal.App.3d at pp. 128-129), and the determination that fluid recovery is not barred under *Blue Chip Stamps v. Superior Court, supra,* 18 Cal.3d 381 (*Bruno, supra,* 127 Cal.App.3d at p. 126).

tributed by one of several practical procedures that have been developed by the courts.

In order to assess the propriety of the fluid recovery method selected by the trial court in the present case, it is necessary to review briefly the available alternatives. The principal methods include a rollback of the defendant's prices, escheat to a governmental body for either specified or general purposes, establishment of a consumer trust fund, and claimant fund sharing. All of these methods promote the policies of disgorgement and deterrence by ensuring that the residue of the recovery does not revert to the wrongdoer. However, they differ substantially in their compensatory effect and in their suitability for particular cases.

■ In determining which method to employ, the courts should consider: (1) the amount of compensation provided to class members, including nonclaiming (or "silent") members; (2) the proportion of class members sharing in the recovery; (3) the extent to which benefits will "spill over" to nonclass members and the degree to which the spillover benefits will effectuate the purposes of the underlying substantive law; and (4) the costs of administration. (See generally, Shepherd, *Damage Distribution in Class Actions: The Cy Pres Remedy* (1972) 39 U.Chi. L.Rev. 448, 464 [hereafter *Cy Pres Remedy*].)

■ Under the price rollback approach, the uncollected portion of the fund is distributed through the market by lowering the price of the defendant's product for a specified period.[8] For example, the class action in *Daar* v. *Yellow Cab* (1967) 67 Cal.2d 695 [63 Cal.Rptr. 724, 433 P.2d 732] was resolved by "refunding" taxicab overcharges through a court-ordered reduction in fares. (See *Blue Chip Stamps* v. *Superior Court, supra,* 18 Cal.3d at p. 388, fn. 1 (conc. opn. of Tobriner, J.).)

Price rollbacks are particularly effective for remedying overcharges on items which are repeatedly purchased by the same individuals. In cases involving such "repeat items," the individuals who were overcharged are likely to benefit from the reduced prices. (See 3 Newberg, Class Actions (1977) § 4620, p. 85; see also *Cy Pres Remedy, supra,* 39 U.Chi. L.Rev. at pp. 461-462.)

None of the parties has proposed a price rollback in the present action. This method is not appropriate in nonmonopoly markets like the jeans market since it compels consumers to collect their refunds by making further

---

[8]The following discussion owes much to the scholarly brief submitted by amici Consumers Union et al.

purchases of the defendant's products, to the detriment of the defendant's competitors. (See 3 Newberg, Class Actions, *supra,* § 4620, p. 85; *Cy Pres Remedy, supra,* 39 U.Chi. L.Rev. at pp. 462-463.) Further, the price of jeans to the consumer is fixed not by the defendant, but by independent retailers. Hence, a price rollback would pose difficult if not insuperable management problems.

■ A second form of fluid distribution is "earmarked escheat." Under this approach, the uncollected funds are disbursed to a responsible governmental organization for use on projects that benefit noncollecting class members and promote the purposes of the underlying cause of action.

*Market St. Ry. Co.* v. *Railroad Commission* (1946) 28 Cal.2d 363 [171 P.2d 875], though not a class action, provides an example of this method. In that case, this court was faced with the problem of how to refund over $700,000 in streetcar overcharges. Individual riders had been offered an opportunity to collect refunds by submitting sworn applications, but less than $15,000 had been claimed. This court awarded the remaining funds to the City and County of San Francisco, which had purchased the railway subsequent to the overcharges, for the improvement of street car services. The court reasoned that the people of San Francisco, who had paid the overcharges in the first place, would benefit from the improvements. (*Id.,* at pp. 366, 372-373.)[9]

Earmarked escheat provides indirect compensation to silent class members. The recipient governmental body may use class funds to ameliorate the effects of past harm and to reduce the risk of future harm. Administrative costs are minimized by utilizing already extant governmental bodies to administer the fund.[10]

---

[9]Similarly, the settlement in a more recent case provided for the defendant oil company to make annual contributions both to the State Department of Health Services, earmarked for environmental health purposes, and to the State Water Pollution Cleanup and Abatement Account. (*People* ex rel. *George Deukmejian* v. *Occidental Petroleum Corp.* (E.D.Cal. Feb. 6, 1981) Civ. No. 5-79-989 [unpublished stipulated settlement included in the record of the present case].) Other examples abound. (See, e.g., *United States* v. *Exxon Corp.* (D.D.C. 1983) 561 F.Supp. 816, 856-857, affd. in relevant part (T.E.C.A. 1985) 773 F.2d 1240, pp. 1280-1287 [recovery in oil overcharge case paid to the United States Treasury for future distribution to states for use in state and federal energy conservation and related programs]; see generally, 3 Newberg, Class Actions, *supra,* § 4620, p. 86.)

[10]Some commentators have suggested that the benefits of earmarked escheat may be diluted since there is nothing to prevent the Legislature from reducing appropriations to the recipient agency by the amount of the damage award. (See, e.g., Durand, *An Economic Analysis of Fluid Class Recovery Mechanisms* (1981) 34 Stan.L.Rev. 173, 180-181 [hereafter *Economic Analysis*].) However, earmarked escheats can be conditioned on the state's promise not to divert previously budgeted funds. (See *Cy Pres Remedy, supra,* 39 U.Chi. L.Rev. at p. 458, fn. 42.) Though the court's ability to enforce such conditions may be limited, there is no reason to assume that the state would act in bad faith.

Since earmarked escheat depends for its success upon the active cooperation of the government, it should not be employed where—as in the present case—the relevant governmental body opposes its use.

Another alternative is general escheat: payment of the recovery to the general fund of a governmental body. Of all the fluid recovery devices, general escheat provides the least focused compensation to the class. The benefits of the recovery are spread among all taxpayers, and there is no attempt to ensure that the spillover is used to effectuate the purposes of the substantive law. (See generally, *Economic Analysis, supra,* 34 Stan.L.Rev. at p. 180.) The only advantage of general escheat is ease of administration. Hence, it is usually regarded as a last resort for use where a more precise remedy cannot be found. (See, e.g., *Developments in the Law—Class Actions* (1976) 89 Harv.L.Rev. 1318, 1523, fn. 353.)

Intervener advocates a relatively new and increasingly popular form of fluid recovery—the establishment of a "consumer trust fund." Under this approach, the court appoints a board of directors to administer the recovery in the interests of the class. (See generally, Nash, *Collecting Overcharges From the Oil Companies: The Department of Energy's Restitutionary Obligation* (1980) 32 Stan.L.Rev. 1039, 1057-1058.)

Like earmarked escheat, the consumer trust fund device uses the residue to further the purposes of the substantive law and provide indirect compensation to class members. Unlike earmarked escheat, there is no danger that the recovery will be submerged in the state's general fund. However, the consumer trust fund device does entail the establishment of a new organization with its own administrative expenses. To avoid this additional cost, some courts have allocated the funds directly to responsible private organizations. (For examples of this approach, see cases cited in *In re Folding Carton Antitrust Litigation* (N.D.Ill. 1983) 557 F.Supp. 1091, 1109, fn. 10, affd. in part and revd. in part (7th Cir. 1984) 744 F.2d 1252.)[11]

Finally, the residue, or the fund itself, may be divided among the individual claimants. As initially approved, the present settlement incorpo-

---

[11]Of course, a court considering the allocation of funds to an existing private body must be mindful of possible conflicts of interest. An organization seeking the right to administer class funds may view a large recovery as a pot of gold to fund projects ranked high on the group's own agenda but of little or no benefit to the class. Trial courts are frequently called upon to make similar assessments when deciding whether a plaintiff seeking to maintain an action on behalf of a class will fairly and adequately represent the interests of all members of the class. (See 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, §§ 207-209, pp. 245-248.) Where such a conflict is identified, earmarked escheat or the creation of a new body to administer the consumer trust fund may provide suitable alternatives.

rated this "claimant fund sharing" approach. (See generally, *Economic Analysis, supra,* 34 Stan.L.Rev. at pp. 177-178.)[12]

Unlike other methods of fluid recovery, claimant fund sharing uses the entire class recovery to provide monetary compensation to individual class members. Hence, in an appropriate case, it may yield a greater and more direct compensatory impact.

However, claimant fund sharing provides no benefits to silent class members. Further, if there is a windfall, it goes not to further the purposes of the substantive law, but to overcompensate legitimate claimants or to pay erroneous or fraudulent claims. Hence, the advantages of claimant fund sharing can only be realized where a large proportion of class members participate and submit accurate claims. (See generally, *Economic Analysis, supra,* 34 Stan.L.Rev. at p. 178.)

Intervener argues that the trial court abused its discretion in approving the present claimant fund sharing plan. First, she contends that the individual recoveries were so small that only a minority of class members bothered to file claims. She points out that although over 1 million households did come forward, that number must be measured against the total size of the class, estimated by the Attorney General at between 3 and 7 million households. If the fund had been distributed as planned, 60 to 80 percent of the class would have received no compensation—direct or indirect.

In addition, she asserts that a large percentage of the recovery went to pay inflated or baseless claims. The accuracy of the distribution hinged on class members' ability to recall small purchases made more than six years earlier. An informal poll conducted by intervener suggested that a large percentage of consumers could not remember the number of Levi's jeans they had purchased during the relevant period.

This problem was, according to intervener, exacerbated by widespread fraud. The settlement provided no safeguard against fraud for 95 percent of the claims. The 5 percent of claimants who alleged the largest number of jeans were required to resubmit their claims with a sworn statement. Over 80 percent of these claimants preferred to abandon their refunds rather than confirm their claims on pain of perjury. The magnitude of this negative

---

[12]Claimant fund sharing can be used as a method for distributing the residue—that portion of the fund that remains after class members have proved their actual damages. It also can be employed, as here, to distribute the entire fund to individual claimants on a pro-rata basis. Had distribution in this case not been delayed by the appellate process, the class fund would have been distributed pro-rata, leaving little if any residue.

response casts doubt on the accuracy of claims beyond the top 5 percent as well.

Further, there appears to be no reported decision in any jurisdiction approving a plan so lacking in safeguards against fraud. The Attorney General cites *In re Coordinated Pretrial Proceedings, etc.* (D.Minn. 1975) 410 F.Supp. 706. However, the distribution plan in that case required proof for all above-average claims. (*Id.,* at p. 713.) The opinion does not reveal whether notarization or other sworn verification was required.

Finally, intervener suggests that administrative expenses and attorney fees were grossly disproportionate to the compensation received by the average claimant. Administrative expenses were projected at over $2 million. The Attorney General was awarded $1.2 million in attorney fees. By contrast, the average individual's recovery was projected at the time of the court's ruling on the settlement to total between $2.60 and $3, or 30-40 cents per pair of jeans. Hence, it appears that the only substantial beneficiaries of the settlement were a few large claimants—including the state—and the Attorney General, who gained not only the fee award for his office, but also substantial free publicity for his then upcoming gubernatorial campaign.

■ The dissent's response to intervener's arguments is twofold. First, the dissent suggests that trial courts should turn to the *parens patriae* statute (§ 16760) for guidance on how to distribute damages in private consumer class actions. (See conc. & dis. opn., *post,* at p. 490.) However, that statute was not intended to limit the equitable discretion of the courts in managing private consumer class actions. Nor should the courts turn to its narrow provisions for "guidance" on how to exercise their discretion.

The *parens patriae* statute empowers the Attorney General to sue on behalf of persons injured by violations of the Cartwright Act. (§ 16760, subd. (a)(1).) Its damage distribution provisions are narrowly drawn. Subdivision (e)(1) requires that monetary relief recovered pursuant to the *parens patriae* power be distributed "[i]n such manner as the superior court . . . in its discretion may authorize to insure, to the extent possible, that each person be afforded a reasonable opportunity to secure his appropriate portion . . . ." Subdivision (e)(3) provides that the residue "shall be treated . . . as unclaimed property," and eventually escheat to the state's general fund.

The concurring and dissenting opinion's reliance on the *parens patriae* statute finds no justification in law or policy. Far from being intended to supersede or restrict the private consumer class action, the *parens patriae* action is designed to provide a means of redress where a private class action is not viable. (See generally, Jones, *Perspectives in Consumer Advocacy:*

*Antitrust Parens Patriae Suits Pursuant to the Hart-Scott-Rodino Antitrust Improvements Act—A Solution for Wrongs Without Redress* (1977) 5 Pepperdine L.Rev. 77, 78.)[13]

The Court of Appeal's well-reasoned opinion in *Bruno, supra,* 127 Cal.App.3d 120 is instructive on the relation between the *parens patriae* power and private class actions. In that case, the plaintiff class proposed that damages be distributed by a price rollback or earmarked escheat. The defendant sought to strike these methods from the complaint, arguing that the *parens patriae* statute prohibited them in private consumer class actions. (*Id.,* at p. 133.) The court held that the proposed methods should not be stricken from the complaint and stated: "The fact that the law empowers the Attorney General . . . to bring *parens patriae* antitrust lawsuits and specifies the methods for distributing the damages they recover evidences no legislative intent to prohibit fluid class recovery in private antitrust class actions." (*Ibid.*)

In short, as the Attorney General himself convincingly argued in his memorandum in support of certification of the present class, the *parens patriae* statute was not intended to impose any restrictions on the conduct of private consumer class actions.[14]

Nor should the courts seek guidance from the *parens patriae* statute. The two-pronged approach of the statute—individual distribution or general escheat—is overly restrictive in the class action context. It would disfavor or preclude two of the most widely used and effective methods of fluid recovery—the earmarked escheat and the consumer trust fund. Moreover, general escheat, the residue distribution method mandated by the statute, provides the least focused compensatory effect of any of the various methods of fluid recovery. (See *ante,* at p. 475.) To compel the use of this method would be to cripple the "substantial compensatory function" of the private class action (*Bruno, supra,* 127 Cal.App.3d at p. 134).[15]

---

[13]The reserve role of the *parens patriae* action is readily apparent from the fact that it, unlike the private class action, does not provide for the recovery of treble damages. (§ 16760, subd. (a)(2); § 16750, subd. (a).)

[14]This conclusion is in no way altered where, as here, the two types of action are brought together and settled together. To hold otherwise would penalize the Attorney General and the class for employing the *parens patriae* action in its intended role as a backup for private class actions. In view of this conclusion, it is not necessary to decide whether the *parens patriae* statute operates retroactively to cover this action. The alleged violations occurred in 1972-1976. Section 16760 was enacted in 1977. (Stats. 1977, ch. 543, § 1, p. 1747.)

[15]By contrast, the statute's approach is consistent with the character of the *parens patriae* action, which is less concerned with compensation. "The most reasonable interpretation of section 16760, subdivision (e) is that the Legislature has sanctioned the use of a civil action by the Attorney General . . . regardless of the compensatory effect of the action." (*Bruno, supra,* 127 Cal.App.3d at pp. 133-134.)

Aside from invoking the *parens patriae* statute, the concurring and dissenting opinion asserts that the distribution plan reasonably compensated class members since about 1.2 million families may ultimately recover between $10 and $12 each. Though the 1.2 million figure seems impressive at first glance, it is meaningful only when compared with the total class size. As the concurring and dissenting opinion recognizes, it is the "'correlation' or 'overlap' between the injured class of persons and the class to be benefitted" (conc. & dis. opn., *post,* at p. 490)—not the absolute number of persons recovering—that provides the principal criterion for assessing the compensatory effectiveness of a distribution plan.

The trial court made no finding as to the size of the class. Further, the court denied intervener's attempt to discover that information. The Attorney General estimated the class size at between 3 and 7 million households. With only this broad estimate to go by, the 1.2 million figure—between 20 and 40 percent of the class—does not support the concurring and dissenting opinion's summary assertion that the settlement as initially approved reasonably compensated class members. This conclusion is strengthened by the likely high incidence of erroneous or fraudulent claims.

### IV.

Due to the practical considerations set forth earlier in this opinion, this court has concluded that the judgment should be affirmed. But far more is at stake than the decision whether to affirm or reverse. Today's ruling will serve as a source of guidance for both the trial court on remand and for other courts in confronting the largely uncharted area of fluid recovery in consumer class actions.

In both contexts, the sound approach of *Vasquez* continues to provide the proper framework. The trial courts should have the full range of alternatives at their disposal. In choosing the appropriate method, they should consider the amount of compensation provided to class members, the proportion of class members sharing in the recovery, the size and effect of the spillover to nonclass members, and the costs of administration.

The disposition of the residue on remand is a matter within the discretion of the trial court. However, it should be noted that under the criteria set forth here, amici's suggestion that the residue should be used to establish a consumer trust fund has considerable merit. It is estimated that up to one-half of the original group of claimants may have moved since 1981. Claimants who have moved may be difficult to locate. Hence, further attempts to distribute the entire fund to individual claimants would result in an even lower rate of participation than did the original plan. Amici's consumer

trust fund plan—or a plan employing earmarked escheat in place of the consumer trust fund—would provide some indirect compensation for silent class members, while ensuring that the residue of the recovery is used on projects designed to effectuate the aims of the Cartwright Act.

The judgment is affirmed. The cause is remanded to the trial court for further proceedings consistent with the views expressed in this opinion.

Broussard, J., Reynoso, J., and Sutter (John), J.,* concurred.

**BIRD, C. J.,** Concurring.—In order to secure a majority for today's decision, I have omitted any discussion of intervener's challenges to the trial court's procedural rulings from my opinion. I write separately to emphasize that today's affirmance should not be taken to indicate approval of those procedural rulings. The trial court denied intervener's discovery, placed procedural barriers in the way of objector participation, omitted written objections from the record, refused to fund a survey of class preferences, and approved a nonneutral class notice. In my view, these rulings, taken together, amounted to an erroneous handling of the action. That this error does not warrant reversal is due not to its alleged harmlessness but to the unacceptability—acknowledged by all the parties—of setting this action back to square one.

By way of background, commentators have long recognized that the class action device seeks to fulfill two sometimes contradictory purposes. On the one hand, the class action is a means of enforcing the law. And, the law exists apart from the class membership's preferences. (See Special Project, *The Remedial Process in Institutional Reform Litigation* (1978) 78 Colum.L.Rev. 784, 893.)

On the other hand, the class action is a means of enabling unorganized groups to redress their grievances through the legal process. As such, it does not dispense with the longstanding principle that individuals should control litigation brought on their behalf. (See *Mandujano* v. *Basic Vegetable Products, Inc.* (9th Cir. 1976) 541 F.2d 832, 834-835 [hereafter *Mandujano*].) As Professors Cover and Fiss have observed, the class action device "may have an ultimately dehumanizing effect if it is imbued with a life on its own, apart from the natural persons for whom it was once a tool." (Cover & Fiss, The Structure of Procedure (1979) p. 255.)

Trial courts face the difficult task of managing class actions so that both of these purposes are fulfilled. An overemphasis on class participation can

---

*Judge, Alameda County Superior Court, assigned by the Chairperson of the Judicial Council.

be costly and may render an action unmanageable. On the other hand, an exclusive concern with enforcement of the law may deprive class members of their rights to influence the conduct of actions brought on their behalf.

In the factual and procedural setting of the present case, participatory concerns come to the fore. Class members are not disputing whether or to what extent the defendant violated the law. Their disagreement, which concerns the method for distributing the recovery, does not threaten the viability of the class action.[1] Hence, judicial recognition of class dissent will not defeat enforcement of the law.

More fundamentally, the choice among the possible forms of fluid recovery is not clearly compelled by law. (See majority opn., *ante,* at pp. 472-479.) Nor can this choice be reduced to a simple matter of immediate economic interests, as can be done in some class actions for damages. (See Rhode, *Class Conflicts in Class Actions* (1982) 34 Stan.L.Rev. 1183, 1200 [hereafter Rhode].) Evaluating the relative merits of distributing the recovery to a consumer trust, to the state, or to individuals involves value judgments more significant than a simple calculation of how many pennies each individual will eventually receive.

In exercising their discretion to choose among various legally valid remedies, courts should consider not only the logical merits of the various proposals, but also the breadth and depth of class support for those proposals. Consideration of those factors can minimize the danger that judges will substitute their own value judgments for those of the class. (See Garth, *Conflict and Dissent in Class Actions: A Suggested Perspective* (1982) 77 Nw. U.L. Rev. 492, 520, 531-532 [hereafter Garth]; Rhode, *supra,* 34 Stan.L.Rev. at pp. 1198-1202.)

Trial courts are accorded broad discretion in organizing pretrial proceedings in complex class actions. (See, e.g., *Grunin* v. *International House of Pancakes* (8th Cir. 1975) 513 F.2d 114, 121 [notice]; *Cotton* v. *Hinton* (5th Cir. 1977) 559 F.2d 1326, 1333 [discovery].)[2] However, viewed in the light

---

[1] By comparison, the concerns weighing against an emphasis on class participation and dissent are far stronger at the class certification stage. If the class is not certified, the harm caused by the defendant's violation may never be remedied in *any* fashion. (Cf. *Johnson* v. *Georgia Highway Express, Inc.* (5th Cir. 1969) 417 F.2d 1122, 1124 [differences among class members held not to warrant denial of certification, but subclassing and intervention might be necessary at the remedial stage].)

[2] Though not binding on this court, federal law concerning class action procedures has been applied where consistent with California law and policy. (See *La Sala* v. *American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 872 [97 Cal.Rptr. 849, 489 P.2d 1113]; compare *Bruno* v. *Superior Court* (1981) 127 Cal.App.3d 120, 128 [179 Cal.Rptr. 342] [rejecting federal case law that was inconsistent with California policy].)

of the preceding discussion and the applicable case law, it is apparent that the trial court's procedural rulings, taken together, exceeded the bounds of that discretion.

First, intervener contends that the court erred in denying her attempt to discover the factual basis of the settlement. Intervener made two unsuccessful attempts at discovery. In early March, intervener served interrogatories on the Attorney General. These interrogatories sought to discover information relating to the conduct of settlement negotiations and, in particular, the factual basis of the settlement. The Attorney General objected to every question, primarily on the ground that the interrogatories were not timely. Three weeks before the fairness hearing, intervener moved to compel answers. This motion was denied.

In June, intervener propounded interrogatories and requests for documents relating to the Attorney General's attorney fee request. Again, the Attorney General objected and the trial court denied intervener's motion to compel.

Since objecting interveners are in an adversary relationship with both plaintiffs and defendants, they are "entitled to at least a reasonable opportunity to [conduct] discovery against both." (*Girsh* v. *Jepson* (3d Cir. 1975) 521 F.2d 153, 157.)

Moreover, what transpires in settlement negotiations is highly relevant to the assessment of a proposed settlement's fairness. (See *In re General Motors Corp. Engine Interchange Lit.* (7th Cir. 1979) 594 F.2d 1106, 1124 [hereafter *GM*], citing the Manual for Complex Litigation (1982 ed.) § 1.46, pp. 53-54.) Even attorneys general are not immune from careful oversight in their roles as class representatives. "[T]he prestige attendant upon negotiating a large settlement against a corporate defendant and thereby acquiring reputations as consumer advocates may place public attorneys in a situation analogous to private counsel who hope to win large fee awards." (*GM, supra*, 594 F.2d at p. 1125.)

The Attorney General contends that the denial of discovery was proper because the trial court had before it sufficient information to intelligently approve the settlement. The Attorney General points out that the record comprised nearly 2,000 pages, including "statistical and economic data."

However, the record lacked information that was essential to the court's assessment of the distribution plan. Most important, there were no facts on which to base a finding of class size. Yet, class size is of the essence in determining the compensatory effectiveness of a claimant fund sharing plan.

Such a plan can scarcely be considered reasonable as the sole means of distributing a class fund if the overwhelming majority of class members recover nothing. (See Durand, *An Economic Analysis of Fluid Class Recovery Mechanisms* (1981) 34 Stan.L.Rev. 173, 178.)

In addition, intervener sought to discover sales statistics in order to determine the composition of the class by economic and social group. This information was necessary to determine whether the plan systematically discriminated against lower income and/or minority groups, a charge made by such intervening organizations as the NAACP.

In short, intervener sought information that was essential to the determination of the settlement's compensatory efficiency and basic fairness. Accordingly, the trial court should have granted her motion to compel discovery.

Next, intervener contends that the trial court erred in failing to provide for effective participation by objectors. She points out that would-be objectors were told to mail copies of their written objections to five different addresses. This requirement imposed a burden out of proportion to the likely size of the average individual recovery. There is no apparent reason why the Attorney General could not have received the objections at a single location and sent them on to counsel, thereby saving each individual additional postage.

Further, the over 300 objections actually received were not included in the record or accorded a reasonable response. It is well established that before a settlement may be approved, "[e]ach objection . . . must become a part of the record of the case [and] [t]he trial court . . . must review carefully these objections." (*Mandujano, supra,* 541 F.2d at p. 835; see also *Boyd* v. *Bechtel Corp.* (N.D.Cal. 1979) 485 F.Supp. 610, 617.) "The Court should examine the settlement in light of the [substantial] objections raised and set forth on the record a reasoned response to the objections including findings of fact and conclusions of law necessary to support the response." (*Cotton* v. *Hinton, supra,* 559 F.2d at p. 1331, citing *Mandujano, supra,* 541 F.2d 832.) A trial court's failure to perform these duties has been held to warrant reversal. (*Id.,* at pp. 836-837.)

The Attorney General argues that inclusion of the objections in the record would have served no purpose. He points out that the court had before it his two-page summary of objections and argues that an examination of this summary is enough to show that all of the objections either were baseless or were argued vigorously by intervener.

However, without copies of the objections this court cannot intelligently review the trial court's apparent determination that none of them merited a reasoned response on the record. For example, it is impossible to determine whether the nine objectors whose objections were summarized as "Politics" had a substantial point to make. The same is true of the 13 persons who made "general" objections to the disbursement plan and the 25 who proposed that the refund go to charity, a consumer group, or the State of California. Experience shows that a broad rejection of objections may, on review, turn out to be erroneous. (See, e.g., *GM, supra,* 594 F.2d at p. 1136 [quoting from objectors' letters to refute argument raised by settlement proponent].)

More fundamentally, the trial court's reliance on summarized objections makes a mockery of objectors' due process rights. Class members have a due process interest in expressing their own views to the courts, not in having those views reduced to one-line summaries and expressed by other parties.

Further compounding the problem, those objectors who attended the fairness hearing did not testify. Although there is nothing in the record to support intervener's charge that the court *prohibited* objectors from speaking, it appears that the court did nothing to inform them when they could speak. Courts should not rely on untrained and unrepresented litigants to interrupt court proceedings and insist upon their rights. Here, the court could simply have announced the appropriate time and procedure for making objections.[3]

Intervener further contends that the trial court should have granted her request for $12,000 to conduct studies, including a survey of class preferences. The breadth and depth of class opposition is clearly relevant in assessing the fairness and reasonableness of a settlement, particularly where alternative remedies are available. (See, e.g., *Flinn* v. *FMC Corporation* (4th Cir. 1975) 528 F.2d 1169, 1173, cert. den. (1976) 424 U.S. 967 [47 L.Ed.2d 734, 96 S.Ct. 1462]; *Bryan* v. *Pittsburgh Plate Glass Co.* (*PPG Indus., Inc.*) (3d Cir. 1974) 494 F.2d 799, 803, cert. den., 419 U.S. 900

---

[3]According to the record, up to 344 persons may have informed the court that they wished to object at the fairness hearing.

In its findings of fact, the trial court stated that "345 persons, including the intervenor, filed objections to the proposed settlement in accordance with the terms of the class notice." The class notice stated: "If you wish to object to the settlement, you must file a notice of intention to appear and state all of the reasons you object to the proposed settlement in writing by April 6, 1981." The intervener informed the court of her intention to appear. There is nothing in the record to indicate that the other 344 objectors did not do likewise.

[42 L.Ed.2d 146, 95 S.Ct. 184].)[4] Courts have relied upon class elections to reject the remedial proposals advanced by class representatives. (See, e.g., *East Texas Motor Freight* v. *Rodriguez* (1977) 431 U.S. 395, 405 [52 L.Ed.2d 453, 463, 97 S.Ct. 1891]; see generally, Garth, *supra,* 77 Nw. U.L. Rev. at p. 532.)

Whether or not to spend class funds on elections or surveys must depend on the facts in each case. As noted above, the circumstances of the present case weigh heavily in favor of revealing class sentiments. (See *ante,* at pp. 480-482.) An affirmative effort to elicit class views is particularly appropriate where—as here—the small sum at stake for any particular individual renders a class member's failure to object useless as an indicator of class sentiment. (See *Developments in the Law—Class Actions* (1976) 89 Harv. L.Rev. 1318, 1567-1568.) The proposed settlement's plan of distribution greatly exacerbated that problem by requiring would-be objectors to mail copies of their objections to five different locations. Accordingly, intervener's suggestion that the court should have authorized the funds for a survey has much to recommend it.

Finally, intervener maintains that the class notice approved by the trial court was nonneutral in violation of the case law.

The class notice must "fairly apprise the class members of the terms of the proposed compromise and of the options open to dissenting class members." (*Trotsky* v. *Los Angeles Fed. Sav. & Loan Assn.* (1975) 48 Cal.App.3d 134, 151-152 [121 Cal.Rptr. 637].) It must be "'scrupulously neutral' and emphasize that the court is expressing no opinion on the merits of the case or the amount of the settlement." (*Grunin* v. *International House of Pancakes, supra,* 513 F.2d at p. 122, citing *Philadelphia Housing Auth.* v. *American R. & S. San. Corp.* (E.D.Pa. 1970) 323 F.Supp. 364, 378, and *Cannon* v. *Texas Gulf Sulphur Company* (S.D.N.Y. 1972) 55 F.R.D. 308, 313, fn. 2.) The court should clearly indicate that it has done nothing more than determine that "there is, in effect, 'probable cause' to submit the proposal to members of the class and to hold a full-scale hearing on its fairness . . . ." (Manual for Complex Litigation, *supra,* § 1.46, p. 55.)

The requirement of neutral notice is particularly important where—as here—there has been no ongoing communication between attorneys and class members, and the notice constitutes the first and only official communication to the overwhelming majority of class members.

---

[4] It should be noted that the courts are not mechanically *bound* by expressions of class opposition. (*Flinn, supra,* 528 F.2d at p. 1173; *Bryan, supra,* 494 F.2d at p. 803.) The many arguments against placing undue reliance on majority sentiment are discussed in Rhode, *supra,* 34 Stan.L.Rev. at pages 1232-1242.

In the present case, the trial court made a commendable attempt to cut costs and stimulate response by mailing the legal notice of the proposed settlement along with a "notice of cash refund" and the form for claiming the refund. Unfortunately, due to the layout and ordering of the packet, the announcement of the "cash refund" overshadowed the legal notice itself. Viewed as a whole, the mailing was far from "scrupulously neutral."

The front cover was labelled "Notice of Cash Refund." The back cover also referred exclusively to the cash refund. The return address was that of the Attorney General, not the court. Upon opening the mailing, the recipient would first see the cover letter, entitled "Cash Refund Notice" and signed by the Attorney General. This letter informed the reader that the Attorney General "has settled" a lawsuit and that purchasers of men's and boys' jeans "*are now eligible* for a cash refund of up to $2.00 per pair." (Italics added.) The letter further explained that the mailing was "your claim form" and urged the reader to "read the simple instructions, fill it out and mail it back to us." There was no mention that the settlement had yet to be approved or that the recipient had any option other than filling out the form (and receiving up to $2 per pair claimed) or not filling it out (and receiving nothing).[5]

The Attorney General maintains that the design of the cover and the inclusion of the introductory letter are irrelevant to the sufficiency of the notice. He contends that the legal notice itself, which followed the cover letter, fairly and impartially informed class members of the settlement terms and their options.

However, the notice of proposed settlement must be viewed as a whole and assessed in light of its impact on the ordinary class member. Common sense suggests that cover labels and introductory letters are generally intended to describe and introduce the entire contents of a communication. The assertions that the Attorney General "has settled" the action and that certain purchasers "are now eligible" for refunds strongly implied that the settlement had already been approved and all that remained was to distribute the refund. Hence, readers might well conclude from the labels and the

---

[5]The cover letter, signed by then Attorney General Deukmejian, read as follows:
"Cash Refund Notice
  "Dear Californian,
  "As Attorney General of the State of California, I am pleased to inform you that my office has settled a lawsuit on your behalf, involving the price practices of Levi Strauss & Co. If you or any member of your household purchased Levi's men's and boys' denim or corduroy jeans between January 1, 1972 and December 31, 1976, you are now eligible for a cash refund of up to $2.00 per pair. In most cases, no proof of purchases will be required. This is your claim form. Please read the simple instructions, fill it out and mail it back to us. I urge you to claim your cash and refund now.
                                                                    "Most Cordially,
                                                                    (Signature)"

letter that they were being asked only to fill out the claim form. They might see no need to plow through the tedious "Legal Notice."[6]

The potential for misunderstanding was exacerbated by the media campaign, which was timed to coincide with the mailing. Television ads featuring Michael Landon echoed the cover letter in asserting that the Attorney General "ha[d] settled" the suit, in referring to the notice as a "cash refund announcement," and in urging consumers to claim their refunds. Also, these ads said nothing about the necessity for court approval of the settlement.

Further, the legal notice itself did little to dispel the potential for confusion created by the cover, the introductory letter, and the media campaign. Although the notice did accurately describe the terms of the settlement and set forth the legal options available to the individual (i.e., participation, objection, or opting out of the settlement), it did nothing to describe the options available *to the class* if the settlement were not approved. (Cf. National Conference of Commissioners on Uniform State Laws, Proposed Uniform Class Actions Act § 12(c)(4), reprinted in 32 Bus. Law. 83, 93-94 (1976) [notice of proposed settlement should include a description and evaluation of alternatives considered by the representative parties].)

In line with the need for pragmatic procedural devices to solve the complex problems of class actions (see *Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 820 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513]), the court could have provided the class members with some description of the actual consequences of acquiescence or objection. For example, the court could have permitted intervener and the Attorney General to include in the notice brief arguments for their remedial proposals. Further, the court could have given some indication of the likely consequences of proceeding to trial. For example, according to the Attorney General's own estimate, the action might have yielded $20 to $80 million in damages *prior to trebling* had a trial occurred.

In conclusion, the trial court unduly restricted the class members' participation. Where—as here—there is a substantial intra-class dispute over alternative, legally permissible remedies, trial courts should make special efforts to ascertain class preferences and promote effective participation. In this light, the trial court's procedural rulings, taken together, unduly discouraged class participation.

---

[6] It is instructive to compare the notice in the present case with the "Sample Class Action Notice . . . with Proof of Claim Form" provided in the Manual for Complex Litigation. The sample notice begins with an announcement of the action. It then sets forth briefly the positions of the parties and the options available to class members. The instructions concerning the filing of proofs of claim come last. (Manual for Complex Litigation, *supra*, § 1.45(II), pp. 217-222.)

**GRODIN, J.**—I agree with the majority's quite sensible conclusion that "as a result of the passage of time and changes in the position of intervener no practical purpose would be served by invalidating the settlement of this six-year-old class action." (Majority opn., *ante,* p. 464.) That being the case, I find it unnecessary to take sides in what appears to me a wholly gratuitous debate between the majority and the dissent as to whether the trial court abused its discretion in approving the present claimant fund sharing plan in the first place. (*Id., ante,* p. 476 *ff.;* p. 481 *ff.*) The only remaining question is what the trial court should do with the residue. With one minor reservation,[1] I concur in the majority's useful discussion of various forms of "fluid recovery" as a guide to the trial court's discretion upon remand. (Majority opn., *ante,* pp. 471-476.)

**SUTTER (John), J.***—The majority opinion, in which I concur, does not hold that the trial court abused its discretion and I find no such abuse. The comments in that opinion about certain of the trial court's rulings are, of course, dicta and some are based on hindsight. An example is the conclusion that many claims may have been fraudulent because 80 percent of those in the 5 percent group (those alleging that they purchased the largest number of jeans), who were required to verify their claims, abandoned the claims rather than confirm them by a sworn statement. Obviously, at the time of his order, the trial judge had no way of knowing how many claimants would decide to abandon their claims.

In addition to guidelines for future cases set forth in the majority opinion, I would add another caveat for trial judges: beware of conflicts of interest, not only of private organizations, as observed in the opinion (majority opn., *ante,* p. 475, fn. 11), but also of plaintiffs who are elected public officials.[1] The trial court should consider such questions as these: to what extent, if at all, does plaintiff seek a particular plan of distribution or notice for self-promotion rather than for the best interest of the class? Does plaintiff resist fluid recovery, at least in part, because such a method of distribution would not call for sending notices generating favorable publicity to his or her constituents? Possible conflicts of interest can and should be avoided or minimized—for example, by requiring that notice to potential class members be mailed out by and returned to someone other than the plaintiff.

**LUCAS, J.,** Concurring and Dissenting.—I concur in the majority opinion to the extent that it affirms the judgment and remands the cause to the trial

---

[1] I suggest that the "price rollback" remedy is not a method of distributing "residue" (majority opn., p. 473), but an alternative to the creation of residue.

*Judge, Alameda County Superior Court, assigned by the Chairperson of the Judicial Council.

[1] Business and Professions Code section 16760, subdivision (g) authorizes district attorneys as well as the Attorney General to file *parens patriae* actions.

court for further proceedings, including disposition of the settlement "residue" in an appropriate manner.

I dissent, however, to the majority's glowing approval of the "consumer trust fund" device as a possible distribution method in cases of this kind, and to the majority's strong suggestion, approaching a direction, that the settlement residue be allocated to the creation of such a fund. In my view, while the trust fund device, and other "fluid recovery" methods, might be appropriate in certain limited situations, this is not one of them.

By way of background, the Court of Appeal in *Bruno* v. *Superior Court* (1981) 127 Cal.App.3d 120, 123-124 [179 Cal.Rptr. 342], explained the concept of "fluid recovery" as follows: "The topic of fluid class recovery regularly arises in class actions . . . where the class has many members with relatively small individual claims. In such circumstances, if the class recovers a favorable judgment, it is likely that only a fraction of the class members will have the desire, and documentation, to file an individual claim for part of the damages. Fluid class recovery is thus invariably suggested as a way to distribute the usually substantial amount of remaining damages. The theory underlying fluid class recovery is that since each class member cannot be compensated exactly for the damage he or she suffered, the best alternative is to pay damages in a way that benefits as many of the class members as possible and in the approximate proportion that each member has been damaged, even though, most probably, some injured class members will receive no compensation and some people not in the class will benefit from the distribution; or, as one commentator states it, 'where funds cannot be delivered precisely to those with primary legal claims, the money should if possible be put to the "next best" use.' [Citation.]

"Fluid class recovery normally will be accomplished by either one of the two methods suggested by petitioners. The defendant may be required to lower prices for a period of time or the residue of damages may be given to the state to be used to benefit class members. [Citation.]" Although *Bruno* was entirely silent on the issue, the majority argues that a desirable variation on the second method of fluid recovery is to establish an independent organization—a consumer trust fund—to benefit the class.

Here, however, the trial court specifically found: "The proposed plan of distribution is the best feasible method of giving each class member a reasonable opportunity to claim his or her respective share of the settlement fund; the proposed plan of distribution has adequate safeguards to insure against any undue or fraudulent claims being paid from the settlement fund; there is no basis for concluding that the proposed plan of distribution dis-

criminates against any class members . . . ." Clearly, the trial court did not abuse its discretion in rejecting alternative proposals.

All parties hereto agree that fluid class recovery may possibly serve in an appropriate case as an alternative to more traditional distribution systems. As *Bruno, supra,* indicates, where the injured class members cannot be compensated exactly for the damage they suffered because, for example, of their probable lack of interest in filing a claim or their inability to document their entitlement to a share of the proceeds, a court may consider fluid recovery. (127 Cal.App.3d at p. 123.)

On the other hand, any kind of "fluid recovery," including the creation of a trust fund, may be inappropriate, in a particular case, because of an insufficient "correlation" or "overlap" between the injured class of persons and the class to be benefitted by the form of recovery proposed. (*Id.,* at p. 132.)

Although it is unclear the extent to which the *parens patriae* provisions of the Cartwright Act apply to this case, those provisions afford guidance to the trial courts (see *Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 820 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513]), and they reflect a policy favoring *individual* recovery wherever possible. Among other things, those provisions (1) limit recovery of damages to "Any person who is injured in his business or property . . ." (Bus. & Prof. Code, § 16750, subd. (a)), (2) authorize the Attorney General "to secure monetary relief . . . for injury sustained by . . . natural persons to their property . . ." (§ 16760, subd. (a)(1)), and (3) mandate that each injured person be given "a reasonable opportunity to secure his appropriate portion of the monetary relief" so awarded (*id.,* subd. (e)(1)). Finally, the act provides that any funds awarded by the court as monetary relief which are not "exhausted by distribution . . . [to injured persons] shall be treated . . . as . . . unclaimed property" subject to escheat to the state. (*Id.,* subd. (e)(3).)

Applying the considerations previously set forth in *Bruno, supra,* to the present case, the trial court's distribution plan reasonably assures that the settlement fund will be paid to those consumers actually injured by Levi Strauss' alleged misconduct, thereby obviating any resort to a trust fund remedy. The size of individual claims evidently was not so trivial as to discourage their filing, as approximately 1.3 million claims were filed; the average family ultimately may recover from $10 to $12 according to Levi Strauss' calculations. Moreover, lack of documentation was no obstacle to individual recovery in this case, for the trial court relieved claimants of that obligation, recognizing the likelihood that few potential class members

would have retained any proof of purchase or similar confirmatory documents.

The majority, characterizing the consumer trust fund device as "increasingly popular" and "widely used" (*ante,* pp. 475, 478), cites no case, and our research has uncovered none, that overturned a trial court's settlement distribution plan in favor of a consumer trust fund or other "fluid recovery" long after claims had been filed and substantial monies expended in administering claim procedures. Indeed, our research has uncovered no California case in which the trial court has ever found a consumer trust fund to be appropriate. In the federal courts, several circuits have held or implied that fluid class recovery is never permissible. (*Eisen* v. *Carlisle & Jacquelin* (2d Cir. 1973) 479 F.2d 1005, vacated on other grounds (1974) 417 U.S. 156 [40 L.Ed.2d 732, 94 S.Ct. 2140]; *Windham* v. *American Brands, Inc.* (4th Cir. 1977) 565 F.2d 59, cert. den. (1978) 435 U.S. 968 [56 L.Ed.2d 58, 98 S.Ct. 1605]; *In re Hotel Telephone Charges* (9th Cir. 1974) 500 F.2d 86.) At least one federal appellate court has overturned a trial court's decision to create a consumer trust fund. (*In re Folding Carton Antitrust Litigation* (7th Cir. 1984) 744 F.2d 1252.) Apart from this lack of support for fluid recovery in general, requiring such a recovery here would be unwise in light of the present status of this case. To declare nugatory at this late stage the trial court's efforts to achieve an equitable distribution directly to injured claimants would serve no overriding public purpose. Indeed, it would result in an inexcusable waste of time, money and effort heretofore expended by the settling parties.

Both the majority and the concurring opinions of Chief Justice Bird nonetheless criticize both the terms of the settlement and the trial court's various rulings in support thereof. In light of the fact that neither opinion would, at this late date, overturn the settlement, and indeed the intervener/appellant at oral argument stipulated that the settlement should be approved, these criticisms seem entirely misplaced. Nonetheless, in the interest of fairness to the trial judge and the parties to the settlement, I will briefly comment upon the charges which were seemingly accepted by the majority. (I do not respond to the more personal views expressed in the concurring opinion, as those views do not command majority support.)

First, the majority opinion appears to adopt the intervener's assertion that "only a minority of class members bothered to file claims." (*Ante,* p. 476.) Yet by the April 6, 1981, deadline, 1.3 million claims for 37 million pairs of men's and boys' jeans had been received, a substantial number of claims given the relatively small amounts which were involved. The majority also seems to credit the intervener's argument that "a large percentage of the

recovery went to pay inflated or baseless claims," and that "widespread fraud" took place. (*Ibid.*) I cannot agree.

The detailed statistics presented by the Attorney General showed that the average individual claim was for eight pairs of jeans over the course of five years and that the median claim was six pairs. Neither figure is inherently improbable for many people. The trial court could reasonably have concluded that most claimants made good faith estimates of their purchases and that no substantial fraud occurred. Further, the court's requirement that the largest 5 percent of total claims be treated as suspect (requiring further verification) reasonably prevented fraudulent claims. The top 5 percent claimed 20 or more pairs over the 5-year period. Absolutely no evidence suggests that those who claimed fewer than that number (some 95 percent of the claimants) were, on a large-scale basis, overstating their claims.

The majority also seems to endorse the intervener's suggestion that the Attorney General was awarded attorney fees which were "grossly disproportionate" to the settlement. (*Id.,* at p. 477.) This point lacks merit. The court awarded $1.2 million to the Attorney General's office as attorney fees. The declarations submitted in support of the fee request show that over 7,800 hours were expended by the Attorney General's office, and other evidence confirmed that the fee awarded was reasonable in light of the professional standing of the attorneys who worked on the case, the amount of the settlement ($12.25 million) in relation to prior settlements by Levi Strauss, and the fees awarded in similar cases.

In short, the trial court acted well within its discretion in approving the settlement and ordering its distribution in the manner previously discussed. Although a substantial residue of funds remains undistributed, the question of the proper disposal of these funds is not presently before us. We should not attempt to influence the trial court's ultimate decision in that regard by praising the "considerable merit" (*ante,* p. 479) of a consumer trust fund, a doubtful device which, in my view, remains essentially untested and possesses substantial countervailing disadvantages, particularly in this case.

Mosk, J., concurred.

Appellant's petition for a rehearing was denied May 29, 1986, and the opinion was modified to read as printed above.